**UNITED STATES of America,**

v.

**George Gordon LIDDY et al.**

**In re TIMES MIRROR COMPANY Subpoena.**

**Crim. No. 1827–72.**

United States District Court, District of Columbia.

Dec. 19, 1972.

See also, D.C., 348 F.Supp. 198, D. C., 354 F.Supp. 217.

Earl J. Silbert, Donald E. Campbell, Asst. U. S. Attys., for United States.

Peter L. Maroulis, Poughkeepsie, N. Y., Thomas A. Kennelly, Washington, D. C., for defendant Liddy.

William O. Bittman, and Austin S. Mittler, Hogan & Hartson, Washington, D. C., for defendant Hunt.

Gerald Alch, Boston, Mass., Bernard Shankman, Washington, D. C., for defendant McCord.

Henry B. Rothblatt, Washington, D. C., Betty Thompson, Arlington, Va., Donald E. Cope, Washington, D. C., for defendants Barker, Martinez, Sturgis & Gonzalez.

Timothy B. Dyk, J. Roger Wollenberg, Washington, D. C., for Times Mirror Co.

Herbert J. Miller, Martin D. Minsker, Washington, D. C., for Newspaper Reporters Jack Nelson and Ronald J. Ostrow.

## OPINION

SIRICA, Chief Judge.

This criminal action charges seven individuals with conspiracy, the unlawful interception of oral and wire communications, and burglary in violation of several United States Code and District of Columbia Code provisions. According to the indictment, the alleged offenses occurred principally at the Democratic National Committee headquarters then located at 2600 Virginia Avenue, N. W., in Washington, D. C. Trial in this case is scheduled to begin on January 8, 1973.

### I.

The instant matter is somewhat ancillary to the central proceedings herein, and comes before the Court on motions to quash a subpoena *duces tecum* directed to the Washington Bureau Chief of the Los Angeles Times newspaper.[1] The subpoena requires this person to produce materials in his possession relating to an interview with one Alfred C. Baldwin, III conducted by representatives of the newspaper. The facts leading to the issuance of the subpoena may be simply stated.

In its October 5, 1972, Morning Edition, the Los Angeles Times printed four articles headlined, "Inside Watergate, Bugging Witness Tells of Incident" under the bylines of Jack Nelson and Ronald J. Ostrow, staff writers, "Baldwin Says GOP Unit Disowned Him" under the byline of Jack Nelson, "Gave Memos to Official Baldwin Says" under the bylines of Jack Nelson and Ronald J. Ostrow, and "An Insider's Account of the Watergate Bugging" by Alfred C. Baldwin, III as told to Jack Nelson. Copies of these articles are part of the record in this case. These news stories purport to contain information procured from Alfred C. Baldwin, III "in more than five hours of tape-recorded interviews with the Times."[2] The paper identified Baldwin as one who had "monitored the telephone tap at the Democratic headquarters last May and June from a listening post in the Howard Johnson Motel across the street from the Watergate."[3] The articles generally portray Mr. Bald-

---

1. Three subpoenas were issued and served on December 14, 1972, including the one to John Lawrence, Los Angeles Times Washington Bureau Chief. The other two were directed to Messrs. Jack Nelson and Ronald J. Ostrow, staff writers for the Los Angeles Times. The Times Mirror Company, corporate parent of the Los Angeles Times, filed a motion to quash the subpoena served on Mr. Lawrence. Messrs. Nelson and Ostrow, purporting to be owners of the materials subpoenaed, filed a similar motion to quash the subpoena to Mr. Lawrence. Finally, Messrs. Nelson and Ostrow jointly moved to quash the subpoenas directed to them individually. This opinion has reference only to the first two motions mentioned, those opposing the subpoena to Mr. Lawrence.

2. Los Angeles Times, October 5, 1972, at 1, col. 6.

3. *Id.*

win as an associate of several of the defendants in this case, who participated with them in at least some of the activities cited in the indictment. Materials in the record indicate that Mr. Baldwin testified before the grand jury that returned the indictment herein, and that he will be a key Government witness at the trial.[4]

On October 11, 1972, defendant George Gordon Liddy filed a pretrial motion for a subpoena as authorized by Rule 17(c) F.R.Cr.P. ordering Alfred C. Baldwin, III to produce all documents, notes, tape recordings and writings in his possession relative to his exclusive interview with the Los Angeles Times. The accompanying memorandum of points and authorities stated that "Baldwin has been granted immunity in exchange for his testimony, thus all of his comments regarding the subject of this prosecution are evidentiary and relevant to the defense."[5] The memorandum further noted that the full text of Mr. Baldwin's statements is essential to the defendants' proper preparation for cross-examination. Defendants McCord, Barker, Martinez, Sturgis and Gonzalez joined in the motion. In its response to defendant Liddy's motion, the United States filed an affidavit sworn to by Mr. Baldwin, stating that he, Baldwin, no longer had the materials sought by defendants. Paragraphs 2, 3 and 4 of that affidavit read: "2. I do not have any documents, notes, tape recordings or writings in my possession or under my control relative to my interview with the Los Angeles Times newspaper. 3. I did receive the tape recordings of my interview with Jack Nelson of the Los Angeles Times on October 4, 1972. 4. Thereafter, on or about October 7, 1972 I either erased or destroyed the tapes pursuant to the advice of my attorney John Cassidento."

At a hearing on pretrial motions held October 25, 1972, counsel for the defendant E. Howard Hunt, Jr., noting the destruction of Mr. Baldwin's tapes, orally moved that a subpoena *duces tecum* issue to the Los Angeles Times directing production of the materials in its possession relating to the Baldwin interview. The Court granted that motion, although no subpoena issued at that time. The matter was discussed subsequently at the pretrial conference held December 4, and at the Court's request, supplemental memoranda were filed in behalf of the defendants and the United States. Thereafter, on December 14, 1972, the Court signed

---

4. Mr. Baldwin's grand jury testimony is referred to in defendant Liddy's motion to compel production of the grand jury testimony of Michael Douglas Caddy and Alfred C. Baldwin filed October 11, 1972, and joined in by defendants McCord, Barker, Martinez, Sturgis and Gonzalez, in defendant Hunt's motion for production of grand jury testimony with accompanying memorandum filed on October 11, 1972, and joined in by defendants McCord, Barker, Martinez, Sturgis and Gonzalez, and in the opposition of the United States to the defendants' motions to compel such testimony which opposition was filed on October 24, 1972.

The United States has described Mr. Baldwin as "an important witness," and has not resisted such a characterization made by the defendants on several occasions. See Memorandum of Points and Authorities in Support of Defendant Hunt's Motion for Order to Produce Recorded Grand Jury Testimony of Caddy and Baldwin, filed October 11, 1972, at

11; Memorandum of Points and Authorities in Support of Motion for Production of Certain Evidence Favorable to Defendants, filed October 11, 1972, at 1–5; Transcript of Proceedings, Wednesday, October 25, 1972, at 56, 57, and 75; Transcript of Proceedings, Monday, December 4, 1972, at 94. In the articles listed above in the text, the Los Angeles Times itself has characterized Mr. Baldwin as "a key government witness." The Government has stated that it intends to call Mr. Baldwin to testify. Memorandum of the United States Concerning Production Prior to Trial of Material Subpoenaed from Los Angeles Times Relating to Alfred C. Baldwin, III, filed December 13, 1972, at 2; Transcript of Proceedings, Tuesday, December 19, 1972, at 87.

5. Memorandum of Points and Authorities in Support of Defendant Liddy's Motion for a Subpoena, filed October 11, 1972, at 1.

an order authorizing the service of subpoenas *duces tecum* to the Los Angeles Times Bureau Chief, John Lawrence, and staff writers Jack Nelson and Ronald J. Ostrow. As noted above, Messrs. Lawrence, Nelson, and Ostrow, through counsel, filed motions to quash.[6] A hearing on the motions was held on December 19, 1972, return date of the subpoena to Mr. Lawrence. For the reasons stated below, the motions to quash are denied.

## II.

The purpose and importance of subpoenas *duces tecum* and subpoenas in general to the judicial process are well known. The authority of courts to subpoena witnesses and evidence is a corollary of the duty to testify at judicial proceedings. This duty to come forward with information relevant to the controversy at hand has been recognized as a fundamental instrument of justice since the earliest days of Anglo-American law.[7] The subpoena here in question was issued pursuant to the specific authority of Rule 17(c), F.R.Cr.P. The text of subsection (c) reads:

(c) *For Production of Documentary Evidence and of Objects.* A subpoena may also command the person to whom it is directed to produce the books, papers, documents or other objects designated therein. The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive. The court may direct that books, papers, documents or objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and may upon their production permit the books, pa-

pers, documents or objects or portions thereof to be inspected by the parties and their attorneys.

The question arising here is whether some First Amendment privilege sanctions a newspaper's refusal to produce evidentiary material in its possession relevant to a criminal trial.

At the outset it is important to note what peculiar facts obtain here and what matters are not at issue. The subpoena is directed to a newspaper representative in an attempt to secure any evidence in his possession of an impeaching nature relative to the anticipated testimony at trial of Alfred C. Baldwin, III.[8] By its terms, the subpoena calls for:

All papers, recordings, transcripts or other documents or objects, whether originals or copies, in the possession, custody or control of The Los Angeles Times and/or the Times Mirror Company which embody or relate to information provided to Jack Nelson, Ronald J. Ostrow or any other representative of The Los Angeles Times and/or the Times Mirror Company by Alfred C. Baldwin, III or his representative on or about August, September and October 1972 concerning any and all activities and events described in the various articles appearing in The Los Angeles Times on October 5, 1972 including, but not limited to, the article at page 7, Part II, of the *Morning Final Edition*, under the title, "An Insider's Account of the Watergate Bugging."

At the December 19 hearing, counsel disagreed concerning application of the subpoena's language to specific materials and documents. Based on the representations of counsel that the Los Ange-

---

6. *See* note 1 *supra.*

7. *See* Blackmer v. United States, 284 U.S. 421, 438, 52 S.Ct. 252, 76 L.Ed. 375 (1932) ; Blair v. United States, 250 U.S. 273, 279–280, 39 S.Ct. 468, 63 L.Ed. 979 (1919) ; 1 W. Holdsworth, A History of English Law, 325–26 (7th ed.

1966) ; 5 W. Holdsworth, A History of English Law, 192–93 (7th ed. 1966).

8. The Court does not and cannot state that the tape recordings subpoenaed contain such evidence; it states only that there may be such evidence contained therein. The contents of the tapes have not been divulged.

les Times has no documents given to its reporters by Baldwin, and that the only materials containing *verbatim* statements of Baldwin are recorded tapes of the interview, the Court interpreted the subpoena to Mr. Lawrence as demanding only those tapes. Complaints that the subpoena calls for material privileged by virtue of an attorney-client relationship or work product rule, therefore, are not at issue here. At the same hearing on the 19th the time reference of the subpoena was shortened from August, September, and October, 1972, to the dates of September 28, 1972 through October 5, 1972 inclusive. The Court understands other allegations concerning technical aspects of the subpoena such as defective service, undue hardship in compliance, and unreasonableness of the return date to be matters either never raised or not now before it.[9]

Secondly, we are not dealing here with documents or objects subpoenaed for discovery purposes. This is not the "fishing expedition" which exceeds the authority conferred and objectives contemplated by Rule 17(c).[10] The defendants seek only those statements on the tapes, if any, which may be admissible as impeachment evidence.[11] The Court will not allow the materials produced pursuant to the subpoena to be employed by the parties as a springboard for discovery.

Finally, there is no individual whose identity the newspaper seeks to protect. Mr. Baldwin's name is emblazoned on the pages of the Los Angeles Times October 5, 1972, issue for the world to see.

9. The Times Mirror Company on December 19, 1972, filed a Motion for Extension of Return Date of Subpoena. The motion asked for an indefinite extension. At a hearing held that same day, counsel for Messrs. Jack Nelson and Ronald J. Ostrow joined in the motion, and the Court orally denied the motion. A written order to that effect was entered by the Court on December 18, 1972.

10. *See* Wright & Miller, Federal Practice and Procedure § 274 (1960).

11. The Court has reference, of course, to impeachment by prior inconsistent statements. McCormick discusses the topic as follows:

When a witness has testified to facts material in the case, it is provable by way of impeachment that he has previously made statements relating to these same facts which are inconsistent with his present testimony. The making of these previous statements may be drawn out in cross-examination of the witness himself, or, if on such cross-examination the witness has denied making the statement, or has failed to remember it, the making of the statement may be proved by another witness. . . .

The theory of attack by prior inconsistent statements is not based on the assumption that the present testimony is false and the former statement true but rather upon the notion that talking one way on the stand and another way previously is blowing hot and cold, and raises a doubt as to the truthfulness of both statements.

C. McCormick, Handbook of the Law of Evidence, (1954 ed.) at 63 (footnotes omitted).

The Court is required to caution the jury that such evidence is admitted solely for their consideration in evaluating the credibility of the witness:

The testimony of a witness may be discredited or impeached by showing that he has previously made statements which are inconsistent with his present testimony. The prior statement is admitted into evidence solely for your consideration in evaluating the credibility of the witness. Should you find the prior statement to be inconsistent, you may consider such statement only in connection with your evaluation of the credence to be given to the witness' present testimony in court. You must not consider the prior statement as establishing the truth of any fact contained in that statement.

Criminal Jury Instructions for the District of Columbia (2nd ed., 1972), Instruction 1.06

It should be noted that defense counsel have on occasion suggested discovery uses for the tapes subpoenaed. *See* Transcript of Proceedings, December 4, 1972, at 94, 95, and 104. Such purposes, however, have now been definitely abandoned. *See* Transcript of Proceedings, December 15, 1972, at 7. The sole purpose of the subpoena is to obtain impeachment evidence if available.

In analyzing the narrow issue presented to it, the Court relies chiefly on the recent Supreme Court decision in Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).[12] It is conceded that the specific question facing the Supreme Court in *Branzburg* concerned grand jury investigations and the confidentiality of news sources as opposed to the confidentiality of information and criminal trials. Nevertheless, the principles there enunciated by the Court are of sufficient breadth to be controlling here.[13] Nor can it justifiably be maintained that subsequent opinions in the federal system have limited application of *Branzburg* to the context of grand jury investigations. Such an analysis is unduly limited. The contention of Movants herein that the Second Circuit, for example, has interpreted the *Branzburg* decision to carry such a limitation misconstrues the meaning of the decision's language.[14]

12. As noted in *Branzburg* no federal statutes treat the question of a newspaper or reporter's privilege, although proposed statutes have been introduced in Congress. Branzburg v. Hayes, 408 U.S. 665, 689 and n. 28, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). The Supreme Court at note 27 on page 689, 92 S.Ct. 2646 of Branzburg cites 17 state statutes giving some type of protection to newsmen. These vary widely with respect to persons covered and extent of the protection afforded. *See* Constitutional Protection for the Newsman's Work Product, 6 Harv.Civ.R. & Civ.Lib.L.Rev. 119, 121 (1970). According to the Court's research, only three of the laws include a privilege against revelation of confidential communications (as opposed to confidential sources). *See* Mich.C.L. § 767.5a (1968); N.Y.Civil Rights Law § 79–h (1970); Pa.Stat.Ann. title 28 § 330 (1958).

13. The *Branzburg* Court, for example, speaks frequently in its opinion of the criminal trial situation and confidential communications in contexts related to the central issue of the case. *See, e. g.,* page 679, 92 S.Ct. page 2655, "Petitioners Branzburg and Pappas and respondent Caldwell press First Amendment claims that may be simply put: that to gather news it is often necessary to agree either not to identify the source of information published *or to publish only part of the facts revealed, or both*; . . ." (emphasis supplied); 680, 92 S.Ct. 2655, ". . . they assert that the reporter should not be forced to appear or to testify before a grand jury *or at trial*." (emphasis supplied); 681, 92 S.Ct. 2656, "The heart of the claim is that the burden on news gathering resulting from *compelling reporters to disclose confidential information* outweighs any public interest in obtaining the information." (emphasis supplied); 686, 92 S.Ct. 2658, "These courts . . . have concluded that the First Amendment interest asserted by the newsman was outweighed by the general obligation of a citizen to appear before a grand jury *or at trial, pursuant to a subpoena, and give what information he possesses.*" (emphasis supplied); 690, 92 S.Ct. 2661, "On the records now before us, we perceive no basis for holding that the public interest . . . is insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation *or criminal trial*." (emphasis supplied); 693, 92 S.Ct. 2662, "There remain those situations where a source is not engaged in criminal conduct but has information suggesting illegal conduct by others. Newsmen frequently receive information from such sources pursuant to a tacit or express agreement to withhold the source's name and *suppress any information that the source wishes not published*." (emphasis supplied).

14. Baker v. F & F Investment, 470 F.2d 778 (2nd Cir. 1972). In context, it appears that Judge Kaufman distinguishes *Branzburg* as being concerned principally with the criminal justice system as opposed to civil litigation such as *F & F Investment*. The distinction is not drawn along the lines of grand jury—non-grand jury cases. Judge Kaufman observed that, "[i]f, as Mr. Justice Powell noted in that case, [*Branzburg*] instances will arise in which First Amendment values outweigh the duty of a journalist to testify even in the context of a criminal investigation, surely in civil cases, courts must recognize that the public interest in non-disclosure of journalist's news sources will often be weightier than the private interest in compelled disclosure." Baker v. F & F Investment, (2nd Cir. 1972) at 785. The Court agrees that First Amendment values will weigh differently in civil and criminal actions. The Court sees little relevance in civil decisions to situations such as the one now before it.

There can be little dispute that the common law recognized no privilege which would support a newspaper or reporter in refusing, upon proper demand, to disclose information received in confidence.[15] Such a privilege, if it exists, must grow out of the First Amendment free press guarantee. Quite appropriately, in this Court's view, the Supreme Court has recognized as component parts of that guarantee the freedom to publish without prior governmental approval,[16] a right of circulation,[17] freedom to distribute literature,[18] and the right to receive printed matter.[19] And most recently with the Supreme Court's decision in *Branzburg*, it may be said that a right to gather news has been explicitly acknowledged.[20] While acknowledging this corollary right, however, the Court rejected the claim that such a right implies a privilege to protect the identity of news sources. After citing numerous cases in which restrictions on the right to gather news have been sustained,[21] the Court classified the requirement to answer subpoenas and disclose sources as another instance of permissible restriction. The majority noted that "the evidence fails to demonstrate that there would be a significant constriction of the flow of news to the public if this Court reaffirms the prior common law and constitutional rule regarding the testimonial obligations of newsmen."[22] Thus, with respect to the claim of privilege, the *Branzburg* decision can in no wise be said to go further than to require "the striking of a proper balance between freedom of the press and the obligation of all citizens go give relevant testimony with respect to criminal conduct."[23] The moving parties in *Branzburg* sought a privilege, but the Court declined to grant it.[24]

■■ If then, the First Amendment right to gather news, affords no absolute privilege against the compelled revelation of news sources, this Court is hard put to understand how it may find such a privilege against the disclosure of confidential information relevant to a criminal trial. The Court's reasoning is this: despite the fact that the newsman's ability to gather news may be hampered if he cannot guarantee confidentiality, the Supreme Court has said that the right to gather news does not give him a First Amendment privilege to resist a demand by proper authority that he divulge a source's identity. What makes the need to withhold confidential *information* more compelling and therefore more deserving of constitutional protection? In the context of the matter now before the Court, at least, the need for a privilege can only be described as substantially less compelling than that asserted in *Branzburg*; indeed, the Court is convinced that *Branzburg* here requires a finding of no privilege.

The present proceeding is linked to a criminal trial as opposed to a grand jury

15. *See* Note, Reporters and Their Sources: The Constitutional Right to a Confidential Relationship, 80 Yale L.J. 317, 321 and authorities cited at n. 14 (1970); Annotation, 7 ALR3d 591, 592–96 (1966).

16. Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).

17. Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936).

18. Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946); Martin v. City of Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943).

19. Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965).

20. Branzburg v. Hayes, 408 U.S. 665, 681, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).

21. Branzburg, *supra* note 20 at 683–685, 92 S.Ct. 2646.

22. Branzburg, *supra* note 20 at 693, 92 S.Ct. at 2662.

23. Branzburg, *supra* note 20 at 710, 92 S.Ct. at 2671 (concurring opinion of Mr. Justice Powell).

24. Branzburg, *supra* note 20 at 690, 92 S.Ct. 2646.

investigation. Where *Branzburg* denied a privilege in favor of the public interest in law enforcement, this Court denies a privilege in favor of the rights of an accused to a fair trial. The Court believes that while the public has a crucial interest in the investigation and punishment of criminal activity, it must have an even deeper interest in assuring that every defendant receives a fair trial. The Court, of course, expresses no opinion as to the guilt or innocence of any one or all of the seven defendants herein, but emphasizes again its commitment to a fair trial for all parties to this case. If impeachment evidence is available, it is critical that the defendants have access to it.[25] If the "striking of a proper balance" is required, as Mr. Justice Powell suggests, this Court will aways strike the balance in favor of due process. The "heart of the claim" in *Branzburg* as stated by the Court was that "the burden on news gathering resulting from compelling reporters to disclose confidential information outweighs any public interest in obtaining the information."[26] That claim was rejected there, and it is rejected here.

Secondly, as in *Branzburg*, the Court is for the present unconvinced,

> that a virtually impenetrable constitutional shield, beyond legislative or judicial control, should be forged to protect a private system of informers operated by the press to report on criminal conduct, a system that would be unaccountable to the public, would pose a threat to the citizen's justifiable expectations of privacy, and would

equally protect well-intentioned informants and those who for pay or otherwise betray their trust to their employer or associates.[27]

As with the system of informants used by law enforcement officers, control should remain in public, not private, hands.[28] It stands reason on its head to contend that justice is served when a prosecution witness, by private agreement with a newspaper reporter, may deny a defendant access to materials which contain prior statements of the witness, statements that possibly might be admissible into evidence to discredit or impeach that witness. For reasons known best to himself, Mr. Baldwin has elected to make statements to the press on the subject of the trial at which he will be called as a government witness. The Court fails to see why he should now be permitted to indirectly withhold those statements from the defendants. As stated by the Court in *Branzburg*, "Private restraints on the flow of information are not so favored by the First Amendment that they override all other public interests."[29] Mr. Baldwin is an important witness in this case and the defendants are in jeopardy of their liberty. The Court finds it difficult in such circumstances to institute a privilege protecting against the disclosure of confidential communications received from a known source.

Finally, the Court cannot distinguish the speculative nature of the harm that Movants anticipate will follow a denial of the motions to quash from the "consequential, but uncertain, burden on news

---

25. The Court finds no merit in Movant's suggestion that the defendants already have access to sufficient sources of any prior inconsistent statements made by Baldwin. *See* Times Mirror Company memorandum in support of the motion to quash, at 26. How much will be "sufficient" ? The Court prefers to draw the line at "all" the evidence rather than at "sufficient" evidence.

26. Branzburg, *supra* note 20 at 681, 92 S.Ct. at 2656.

27. Branzburg, *supra* note 20 at 697, 92 S.Ct. at 2664.

28. Branzburg, *supra* note 20 at 698, 92 S.Ct. 2646.

29. Branzburg, *supra* note 20 at 697, 92 S.Ct. at 2664.

gathering" which made the Supreme Court reluctant to extend protection.[30] The Movants have supplied several affidavits from distinguished newsmen [31] depicting the injury which it is predicted will descend upon newspapers should the Court enforce the subpoenas herein. Some assert that the press foresees greater danger in a requirement to produce confidential information than in a similar requirement to divulge the identity of a source. The Court is grateful to have the benefit of these views, and by its decision intends no disrespect to the expertise and sincerity of these affiants. Nevertheless, the Court remains convinced that the bulk of these arguments hit beyond the mark. The Court's decision "involves no restraint on what newspapers may publish or on the type or quality of information reporters may seek to acquire, nor does it threaten the vast bulk of confidential relationships between reporters and their sources.[32] Given the unique facts presented here, the Court expects that its decision will have little precedential value for defendants or prosecutors who might wish to subject newspapers to an abusive "flood of subpoenas." Nor is there any basis here on which parties in a criminal case might support a simply indiscriminate use of the subpoena power. Here we have a criminal trial in which a chief government witness, having been offered immunity from prosecution, has seen fit to give a lengthy and apparently comprehensive first person narrative account to newspaper reporters of the activities he will testify about at trial. It is known that the full interview has been tape recorded, that the witness has exacted a promise from the reporters that he may censor any publication of his statements, and that the witness has destroyed his copy of the tape recordings. The Court is requiring that the newspaper, now in possession of the only other known set of tapes, produce those tapes to give the defendants access to any impeachment evidence the recordings may contain.[33] Not only is an aggregation of comparable circumstances not likely to be repeated often in the future, but the entire situation evinces nothing but good faith on the part of the defendants. Furthermore, Movants have received the benefit of safeguards sought by their colleagues in *Branzburg* even though under that decision they are not entitled to such

---

30. *See* Branzburg, *supra* note 20 at 690, 92 S.Ct. at 2661.

Counsel emphasized the argument that denial of the motions would "open the newspapers of this country to, and their files and their reporters to, a veritable flood of subpoenas. . . ." Transcript of Proceedings, December 19, 1972, at 57.

Branzburg characterized similar forecasts of harm raised there as either uncertain or unwarranted. *See* pages 692–695, 92 S.Ct. 2646.

31. Included among the affiants are: Fred P. Graham of CBS News, Edwin O. Guntham, an editor of the Los Angeles Times, James C. Hagerty, presently a corporate vice president at ABC, Robert J. Manning, editor-in-chief of *Atlantic Monthly*, Clark R. Mollenhoff, Washington Bureau Chief of the Des Moines Register & Tribune, John Seigenthaler, editor of The Tennessean, William F. Thomas, an editor of the Los Angeles Times, as well as Jack Nelson and Ronald J. Ostrow, and William A. Niese, house counsel for the Los Angeles Times.

32. Branzburg, *supra* note 20 at 691, 92 S.Ct. at 2661.

33. There, of course, can be no assurance at this point that the defendants, if permitted to complete their examination of the material subpoenaed, will obtain statements made by Mr. Baldwin that could be interpreted by a jury as impeaching. It is significant, however, that the probability of the subpoenaed material containing prior inconsistent statements is much greater here than would usually be the case where only sketchy accounts or occasional statements of the witness are available.

protection.[34] In addition to all this, Movants may be assured that restraint will characterize any use of the subpoenaed materials.[35]

 In view of the law relative to a newspaper or newsman's privilege, the Court cannot in good conscience go further than it already has to protect First Amendment principles in conflict with the rights of defendants in a criminal trial.[36] The motions to quash are denied, and Mr. Lawrence, having flaunted the order of the Court to produce the tapes in his possession thereby bringing disrespect upon the Court, is cited for contempt pursuant to 18 U.S.C. § 401 and Rule 17(g), F.R.Cr.P., and remanded to the custody of the Attorney General unless or until he purges himself of the contempt.

34. At page 680, 92 S.Ct. at page 2655 of the Branzburg opinion, the moving parties list three criteria or prerequisites which should, in their view, be met before a newsman is "forced either to appear or to testify before a grand jury or at trial." These appear to be: (1) a showing of sufficient grounds for believing that the reporter has information relevant to the crime involved, (2) a showing that the information the reporter has is unavailable from other sources, and (3) a showing that the need for information is sufficiently compelling to override the claimed invasion of First Amendment interests occasioned by the disclosure. These would-be prerequisites have been met here in their entirety.

35. As mentioned in the oral argument by counsel (*See* Transcript of Proceedings, Tuesday, December 19, 1972 at 69, 79–81.), the tapes are to be produced to the Court for its inspection *in camera*. The Court will follow a procedure of this type: A stenographic record of the tapes will be made in chambers by an official court reporter. If desired, counsel for Mr. Baldwin, Messrs. Nelson and Ostrow, and the Times Mirror Company or Los Angeles Times might be present. Both the tapes and the transcript will be impounded until further order of the Court. The transcript being in the nature of "Jencks material" will be made available to defendants, with appropriate deletions,

either at or just prior to trial as the Court's discretion suggests. It should be noted that the reason for seeking production at this time is to avoid delay in the trial of this case, the Court intending to have the jury sequestered. Delay has been anticipated in view of the representations of Movants herein that a subpoena will be resisted through appeal to the fullest extent possible.

36. It deserves at least passing mention that the Los Angeles Times and its reporters have apparently themselves breached their agreement of confidentiality with Mr. Baldwin. In the words of its background story on the Baldwin interview,

Baldwin's attorneys, John V. Cassidento and Robert C. Mirto, urged the Times Wednesday not to print their client's interview or any stories based on it. They did so after being contacted by Earl Silbert, Chief Assistant to the U. S. Attorney in Washington, who is in charge of the government's case.

Silbert warned Cassidento that the government might consider its agreement not to prosecute Baldwin broken if he spoke out on the case and also said Baldwin might be held in contempt of court according to Cassidento.

*See* Los Angeles Times, October 5, 1972, at 1, col. 6.