THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v NAVATRO LE GRAND, Respondent; LEE HAYS, Appellant.

Second Department, April 16, 1979

## APPEARANCES OF COUNSEL

*Clark Wulf Levine & Peratis (Melvin L. Wulf* of counsel), for appellant.

*Joel S. Ezra* for respondent.

*Henry R. Kaufman* for Association of American Publishers, Inc., *amicus curiae.*

*Irwin Karp* for Authors League of America, Inc., *amicus curiae.*

## OPINION OF THE COURT

TITONE, J. P.

The issue presented on appeal is whether under the circumstances, the appellant, who is an author, was justified in refusing to divulge his notes of an interview with a probable prosecution witness where the defense subpoenaed those notes for possible use for impeachment purposes.

### THE FACTS

Appellant, Lee Hays, has written and published approximately 30 books, fiction and nonfiction, as well as several magazine articles. As an employee of CBS News, NBC News, and television station WNET on divers occasions, he has also written, produced and directed numerous documentary films and news broadcasts.

In February, 1977 Mr. Hays contracted with Thomas Y. Crowell, Inc., now a subsidiary of Harper & Row, Inc., to write

a book about the alleged crime "family" of one DeVernon Le Grand. Mr. Hays attended three trials of "family" members the ensuing year.

During such period appellant also conducted a number of interviews to obtain information about the members of the Le Grand family and their activities. One such interview was with Willie Frank Holman, for many years a member of the Le Grand household. Holman has testified as a witness for the People at all the Grand Jury presentations and at the trial of two of the family members. He is expected to testify for the prosecution at the forthcoming trial of defendant Navatro Le Grand, who is charged with murder in the second degree. The stated purpose of the subpoena under review, issued on behalf of the defendant and served on appellant, is to obtain evidence of an impeaching nature with which to attack Mr. Holman's credibility, and for discovery and inspection of the following material: "tape recording[s] and notes of your conversations with an individual named Willie Frank Holman, which tape recordings or notes relate to the above entitled action and which notes and/or tape recordings were made by you, subsequent to the trial of the action entitled The People of the State of New York v. DeVernon LeGrand (known as the Timmons case) and prior to the commencment of the action entitled The People of the State of New York v. Aron Le-Grand and Steven Straun LeGrand."

Appellant moved at Criminal Term to quash the subpoena claiming, *inter alia,* that it violates the First and Fourteenth Amendments to the United States Constitution, section 8 of article I of the New York State Constitution and section 79-h of the New York Civil Rights Law. He claims that Mr. Holman's interviews were conducted with the understanding that the information would not be revealed prior to the publication of appellant's book. To compel its disclosure, argues appellant, would be to violate his privilege as a writer.

Criminal Term denied the motion to quash, holding that Mr. Hays was an author, not a journalist, and therefore was not protected either by the "shield law" (Civil Rights Law, § 79-h) or the "freedom of the press" provisions of the United States and New York State Constitutions. It also held that Mr. Holman's information was imparted without any agreement for confidentiality. Based on such findings, Criminal Term ordered that appellant must produce his notes in the event Holman testifies at Le Grand's trial.

THE "SHIELD LAW"

■ Appellant contends that section 79-h of the Civil Rights Law should be read to include authors as well as journalists. Such a liberal construction, it is suggested, would fulfill the legislative intent of protecting the free flow of information necessary to maintain democracy, since appellant is reporting the same events as would the daily journalist, even though publication is deferred to offer the public a more thorough picture of the Le Grand family. I disagree with such reasoning and conclusion.

It is clear from a reading of section 79-h of the Civil Rights Law, quoted below, that the language therein is specific in its definitions and limited as to those it is meant to benefit:

"Special provisions relating to persons employed by, or connected with, news media.

"(a) Definitions. As used in this section, the following definitions shall apply:

"(1) 'Newspaper' shall mean a paper that is printed and distributed ordinarily not less frequently than once a week, and has done so for at least one year, and that contains news, articles of opinion (as editorials), features, advertising, or other matter regarded as of current interest, has a paid circulation and has been entered at United States post-office as second-class matter.

"(2) 'Magazine' shall mean a publication containing news which is published and distributed periodically, and has done so for at least one year, has a paid circulation and has been entered at a United States post-office as second-class matter.

"(3) 'News agency' shall mean a commercial organization that collects and supplies news to subscribing newspapers, magazines, periodicals and news broadcasters.

"(4) 'Press association' shall mean an association of newspapers and/or magazines formed to gather and distribute news to its members.

"(5) 'Wire service' shall mean a news agency that sends out syndicated news copy by wire to subscribing newspapers, magazines, periodicals or news broadcasters.

"(6) 'Professional journalist' shall mean one who, for gain or livelihood, is engaged in gathering, preparing or editing of news for a newspaper, magazine, news agency, press association or wire service.

"(7) 'Newscaster' shall mean a person who, for gain or livelihood, is engaged in analyzing, commenting on or broadcasting, news by radio or television transmission.

"(8) 'News' shall mean written, oral or pictorial information or communication concerning local, national or worldwide events or other matters of public concern or public interest or affecting the public welfare.

"(b) Exemption of professional journalists and newscasters from contempt.

"Notwithstanding the provisions of any general or specific law to the contrary, no professional journalist or newscaster employed or otherwise associated with any newspaper, magazine, news agency, press association, wire service, radio or television transmission station or network, shall be adjudged in contempt by any court, the legislature or other body having contempt powers, nor shall a grand jury seek to have a journalist or newscaster held in contempt by any court, legislature or other body having contempt powers for refusing or failing to disclose any news or the source of any such news coming into his possession in the course of gathering or obtaining news for publication or to be published in a newspaper, magazine, or for broadcast by a radio or television transmission station or network, by which he is professionally employed or otherwise associated in a news gathering capacity."

These provisions evince a clear legislative design to benefit "professional journalists" and "newscasters" only. They should not by judicial fiat and strained interpretation be deemed to encompass those engaged in a different field of writing and research.

Moreover, beyond peradventure the information obtained by appellant was of a nonconfidential nature. In his supporting affidavit on the motion to quash the subpoena, appellant stated that he had an understanding with Holman that he "would not reveal the information to anyone prior to its publication in the book." Yet, Holman had already testified before several Grand Juries and one trial court regarding the murders which are the subject of this indictment. Such loquacity undermines any claim of confidentiality. In addition, the information was imparted for the express purpose of appearing in appellant's forthcoming book. This was not an agreement of confidentiality; it was, at best, an agreement to postpone divulgence of the information until the book was

published. Hence, absent any proof of a "cloak of confidentiality", the "shield law" could not inure to appellant's benefit in any event. (See *Matter of Wolf v People,* 69 Misc 2d 256, affd 39 AD2d 864; *Matter of WBAI-FM v Proskin,* 42 AD2d 5.)

### THE CONSTITUTIONAL CLAIMS

Appellant next contends that, even if outside the ambit of section 79-h of the Civil Rights Law, his information is shielded by the First Amendment to the United States Constitution and section 8 of article I of the New York State Constitution. The latter reads, in part: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press."

In this regard, appellant does not claim an absolute privilege from disclosure of his information. He only claims that before he is compelled to do so, the court should be sure that there is a real reason to intrude on his "free press" interest. Therefore, proof should be taken to assure that the matter being sought is relevant and material to an issue of fact necessary for the defense of the case and that substantially similar matter is unavailable from any other source.

I do not agree with this formulation. The Sixth Amendment to the United States Constitution guarantees the right of every criminal defendant "to be confronted with the witnesses against him", including the right of cross-examination *(Douglas v Alabama,* 380 US 415, 418). To effectuate this right, prior inconsistent statements are instrumental to an attack on the credibility of an adversarial witness (McCormick, Handbook of Law of Evidence [1954 ed], p 63).

Subpoenas duces tecum are vehicles by which such evidence may be procured, and their importance has long been recognized. (See *Blackmer v United States,* 284 US 421; *Blair v United States,* 250 US 273, 279-280.)

Juxtaposed to the Sixth Amendment considerations are those of the First Amendment. It cannot be questioned that the freedom of the press extends to books and "every sort of publication which afford a vehicle of information and opinion" *(Lovell v Griffin,* 303 US 444, 452). That freedom has always commanded great deference throughout the history of our constitutional law because "the widest possible dissemination

of information from diverse and antagonistic sources is essential to the welfare of the public" *(Associated Press v United States,* 326 US 1, 20).

██ ██ Nevertheless, in balancing the societal interests, the Supreme Court of the United States has said that there is no First Amendment privilege to resist a demand by the *prosecution* that a reporter appear before a Grand Jury and divulge his source's identity *(Branzburg v Hayes,* 408 US 665). In so holding, the court voiced disagreement with the argument that by its reaffirming the prior common-law and constitutional rule regarding the testimonial obligation of newsmen, there would be a significant constriction of the flow of news to the public *(Branzburg v Hayes, supra,* p 693). More important than any inhibiting effect on the right to gather news is the public interest in the fair administration of justice. That interest is even more compelling when, as in the case at bar, it is information which is being withheld and not the identity of the source. (See *New York Times Co. v Jascalevich,* 439 US 1317, 1331.)

If the holding in *Branzburg (supra)* subordinated the need for confidentiality to the prosecution's need to present its case, should the result be any different when a defendant's Sixth Amendment rights are at stake? The answer is obviously that it should not.

A defendant's right to a fair trial encompasses therein a right of access to impeachment evidence. It is a matter of due process which cannot be outweighed by the claim that confidential sources will dry up should their information be disclosed in a criminal case *(Branzburg v Hays,* 408 US 665, 681, *supra).* As Judge SIRICA wrote in *United States v Liddy* (354 F Supp 208, 215): "It stands reason on its head to contend that justice is served when a prosecution witness, by private agreement with a newspaper reporter, may deny a defendant access to materials which contain prior statements of the witness, statements that possibly might be admissible into evidence to discredit or impeach that witness."

Moreover, in *United States v Nixon* (418 US 683, 709), the United States Supreme Court drew no distinction between the defense and the prosecution in ordering production of tapes: "We have elected to employ an adversary system of criminal justice in which the parties contest all issues before a court of law. The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of

criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or *by the defense."* (Emphasis supplied.)

Consistent with the reasoning of the Supreme Court in *Branzburg* and *Nixon (supra),* I conclude appellant may not derive the protection he seeks from the First Amendment. (See *United States v Liddy,* 354 F Supp 208, *supra; Matter of Farber,* 78 NJ 259, cert den 439 US 997; cf. *State v St. Peter,* 132 Vt 266; *Brown v Commonwealth,* 214 Va 755.) By a parity of reasoning, appellant's State constitutional claim must fail.

I believe this is the first case in which *an author* has claimed a constitutional privilege to withhold duly subpoenaed documents and tapes material to the defense of a criminal case. Appellant is writing an account of the pursuits of a De Vernon Le Grand and his "family". The book is a detailed examination of any crimes they committed, the police investigations thereof, and the prosecutions which ensued. In an affidavit, appellant avers that the book is a description of what has transpired in the case along with the author's insights into the response of the judicial process to the public's demand for protection against crime, and the concomitant obligation to extend due process of law to those accused of crime.

Under these facts, I conclude that the author's interest in protecting the confidential information is manifestly less compelling than that of a journalist or newsman. To report the news and remain valuable to their employer and the public, professional journalists must constantly cultivate sources of information. Newsmen must also maintain their credibility and trustworthiness as repositories of confidential information.

However, appellant, like most authors, is an independent contractor whose success invariably depends more on the researching of public and private documents, other treatises, and background interviews, rather than on confidential rapport with his sources of information. Thus, his contacts with

confidential sources, being minimal vis-à-vis those of an investigative journalist, would be far less likely to have any impact on the free flow of information which the First Amendment is designed to protect.

The court defers comment at this time with respect to some future situation in which an author's role would be clearly that of an investigative journalist whose work product will be published in book form.

Finally, my colleagues and I concur with the minimizing procedure propounded by Madam Justice KOOPER at Criminal Term. So that production of appellant's notes and tape recordings will be compelled only if necessary, and no more of appellant's notes and tapes will be turned over than is required for the impeachment of Mr. Holman, it was properly ordered that:

"1. The subpoena served upon the movant herein shall continue in full force and effect and Mr. Hays shall hold himself available for the production of his notes and tape recordings in respect of his interview with Mr. Holman.

"2. After the direct examination of Mr. Holman is completed, Mr. Hays shall turn over to defense counsel any and all portions of his material which relate to the subject matter of the witness' testimony.

"3. If the notes and/or tapes contain material not relevant to said testimony they are to be produced for an in camera inspection by the court, so that the extraneous matter can be segregated."

O'CONNOR, MARTUSCELLO and MANGANO, JJ., concur.

Order of the Supreme Court, Kings County, dated January 4, 1979, affirmed, without costs or disbursements.