OPINION OF THE COURT
Sybil H. Kooper, J.
The New York Times Company and Sheila Rule, a reporter in its employ, move pursuant to CPLR 2304 to quash subpoenas duces tecum served upon them by defense counsel. The subpoenas directed to Ms. Rule and the New York Times Company on behalf of the defendant, Gino Bova, seek “all notes, transcriptions, memoranda, or tape recordings pertaining to the interview of one Dennis Dixon.”
*15 The defendant was indicted for the murder of Willie Turks, a transit worker, who was beaten to death on June 22, 1982. The incident giving rise to the death of Turks allegedly arose when Turks, Dixon, and another person were confronted by a group of people who expressed a desire to have them leave the neighborhood where the events transpired. Dixon is listed as a complainant in the fourth count of the indictment, charging assault in the first degree, and the seventh count of the indictment, charging discrimination under the Civil Rights Law.
On January 17, 1983 an article was published in the New York Times entitled, “Scars Linger From Assault In Gravesend.” The article concerned an interview Ms. Rule had with Dennis Dixon. In her story, Ms. Rule quoted Dixon as stating:
“When they started shouting at us and calling us names I decided to argue with them that we had every right to be there and wanted to keep coming there.
“In some ways, I feel that my decision to confront them might have put Turks in the position he was in.”
Two DD5’s (police reports) concerning these events were turned over to defense counsel. They read in part as follows: “Mr. Dixon states that he entered the Bagel Deli at about Midnight and as he was entering his auto a group of guys started calling out Ethnic Remarks to him (Hey Nigger) at this point as he was opening the door to his auto he stated to the group, ‘what’s this all about.’ He states he was then hit in the face by a male/white with a beer bottle, and his co-workers were assaulted also and ‘One male approaches the auto and calls out “ ‘Hey-Nigger get out of the neighborhood,’ ” the complainant gets out of his car to speak with male #2. Male #1 now hits Mr. Dixon on the right ear with a beer bottle’
Ms. Rule, the reporter who wrote the story, does not generally cover news Concerning crimes. She did not witness the incident. Her article, appearing some seven months after the event, was in the nature of a human interest story describing the psychological effects of an alleged attack upon one of the complainants. The article does not refer to defendant in any manner.
*16 The District Attorney of Kings County has submitted a memorandum in support of defendant’s position. The District Attorney argues that granting the motion to quash would “set an unfortunate precedent and impact upon criminal prosecution.” In other words, if the motion to quash were granted the defense would be prejudiced today; tomorrow (possibly) the prosecution might be prejudiced in an as yet unknown, unlitigated case. In urging its unusual position, which apparently seeks to assist the defense in obtaining material to establish its potential justification defense and impeach the prosecution’s potential key witness, the District Attorney states: “While agreeing with the Times that defendant Bova’s subpoenas seek information for highty speculative reasons and may in fact be in the nature of a ‘fishing expedition’, the District Attorney has no objection to Bova obtaining the material he seeks.”
Ms. Rule and the New York Times Company move to quash said subpoenas pursuant to three distinct theories. Petitioners initially argue that the material sought to be discovered is irrelevant, immaterial and collateral; secondly, they contend that the subpoenaed material is protected from exposure by New York’s Shield Law (Civil Rights Law, § 79-h, as amd L 1981, ch 468, §§ 1-3); and finally, it is asserted that both the First Amendment of the United States Constitution and section 8 of article I of the New York State Constitution create a “reporter’s privilege” which prevents disclosure of the subpoenaed material.
For the reasons set forth herein, the motions to quash the subpoenas are granted.
I. RELEVANCY AND MATERIALITY
It is settled law that a subpoena duces tecum “may not be used for the purpose of discovery or to ascertain the existence of evidence”. (People v Gissendanner, 48 NY2d 543, 551.) It also may not be used to “fish for impeaching material” (People v Hasson, 86 Misc 2d 781, 783).
Defendant asserts that the information sought from Ms. Rule and the Times is relevant and material because it might shed light on a possible justification defense. It might also provide a source of impeachment material for *17 use against a key prosecution witness should Mr. Dixon testify at trial. In support of this dual claim, defendant urges that in using the word “confront” when interviewed by Ms. Rule, Mr. Dixon portrayed himself as the possible aggressor in the incident that occurred.
The word “confront”, however, when read in context with the preceding paragraph published in the article clearly refers to a verbal confrontation. It is axiomatic that the use of force against another is not justified in response to a mere verbal provocation. Defendant’s interpretation of the word “confront” is grossly speculative and unreasonable.
I further note that the defense of justification is founded upon what a defendant reasonably perceives at the time and place of occurrence. The manner in which Dixon characterized the incident, some seven months after the event, has little to do with defendant’s reasonable perception of the events as they were enfolding. The claim that Mr. Dixon’s interview with Ms. Rule would aid in preparing a justification defense is, at best, exceedingly tenuous. This is in no way meant to reflect upon the viability of any justification defense which may be urged by defendant at trial; these observations are limited to this motion.
Respondent also asserts that Ms. Rule’s article contains statements by Mr. Dixon which contradict what he is alleged to have related to the police, as depicted in the DOS’s, quoted herein.
While the article contains material not in the police reports, it in no way contradicts them. A fair reading of the DOS’s and the article reveals that they are consistent. Additionally, should Mr. Dixon testify at trial, counsel is entitled to, and will be provided with, Mr. Dixon’s Grand Jury testimony and a copy of a statement Mr. Dixon gave to the District Attorney’s office. This material will be turned over to the defense prior to cross-examination and well before the defense would put in its case. The information contained therein may be a source of impeachment material, as well as an aid in the preparation of any possible justification defense.
I would also comment that Ms. Rule’s article touches only tangentially on the crime itself. It is primarily a *18 “human interest” story, contrasting Mr. Dixon’s life prior to and after the incident. There is no indication Ms. Rule devoted much time to discussion of the incident itself with Mr. Dixon. One would assume, absent any evidence to the contrary, the bulk of the interview concerned the “before” and “after” aspects of Mr. Dixon’s life, rather than an exploration of the incident itself.
The Supreme Court of New Jersey, writing in Matter of Farber (78 NJ 259, 276-277), held that it was the obligation of the issuing party to prove: “by a fair preponderance of the evidence including all reasonable inferences, that there was a reasonable probability or likelihood that the information sought by the subpoena was material and relevant to his defense, that it could not be secured from any less intrusive source, and that the defendant had a legitimate need to see and otherwise use it.” The court was careful to point out (p 277) that each case depended upon its unique facts, and made clear that its opinion was “not to be taken as a license for a fishing expedition in every criminal case where there has been investigative reporting, nor as permission for an indiscriminate rummaging through newspaper files.”
Judge Fuchsberg, writing in Gissendanner (supra, p 548), a case dealing with a defense subpoena for the personnel records of two police officers who were key witnesses against the defendants for the purpose of securing possible impeachment material, stated: “when requests to examine [personnel] records are motivated by nothing more than impeachment of witnesses’ general credibility * * * the defendant’s rights have generally been canalized within the bounds of the traditional evidentiary rule that governs the introduction of extrinsic proof of matters collateral to the issues at trial, i.e., its availability rests largely on the exercise of a sound discretion by the trial court”. The court additionally noted (p 549) that: “access has been denied in cases in which the defendant failed to demonstrate any theory of relevancy and materiality, but, instead, merely desired the opportunity for an unrestrained foray into confidential records in the hope that the unearthing of some unspecified information would enable him to impeach the witness”. The defense must “put * * * *19 forth in good faith * * * some factual predicate which would make it reasonably likely that the file will bear * * * fruit and that the quest for its contents is not merely a desperate grasping at a straw.” (Supra, at p 550.)
Finally, reliance upon Jencks v United States (353 US 657) and People v Rosario (9 NY2d 286, cert den 368 US 866) is misplaced. Both cases deal with statements in the possession of the prosecution and the People’s duty to disclose such information to the defense. Neither case may be read as holding that statements in the possession of nongovernmental third parties are discoverable.
II. SHIELD LAW
The New York Shield Law (Civil Rights Law, § 79-h) does not provide a basis for quashing the subpoenas. To successfully raise a claim of privilege under this statute, the information must be imparted to the reporter under a “cloak of confidentiality”. There had to be an understanding, express or implied, that the information will not be disclosed (Hennigan v Buffalo Courier Express Co., 85 AD2d 924; People v Le Grand, 67 AD2d 446; Matter of WBAI-FM v Proskin, 42 AD2d 5; Matter of Wolf, 39 AD2d 864; Davis v Davis, 88 Misc 2d 1). The situation covered in People v Iannaccone (112 Misc 2d 1057) is readily distinguishable from this case. The 1981 amendment to the Shield Law, which extended the protection of the statute to unsolicited information, did not negate the “cloak of confidentiality” requirement. Protection of unsolicited news is fully compatible with the confidentiality requirement (see Matter of WBAI-FM v Proskin, supra, Cooke, J., dissenting). Petitioners herein have failed to adequately assert that the Dixon interview was conducted under the requisite “cloak of confidentiality.”
III. FIRST AMENDMENT PROTECTION
The protections afforded under the First Amendment to the United States Constitution and section 8 of article I of the New York State Constitution provide an independent basis for quashing the subpoenas.
The right to a free and independent press, unburdened by prior restraint, is part of the bedrock of our society. The cases are legion that subpoenas issued to the press invoke *20 First Amendment protections of the press to gather, write, edit, and disseminate news. This does not mean that the First Amendment provides an absolute privilege to the press. Petitioners concede that the press enjoys only a qualified reporter’s privilege which is “grounded in both the First Amendment and in the ‘strong public policy which supports the unfettered communications to the public of information, comment, and opinion.’ ”
The United States Supreme Court, in Branzburg v Hayes (408 US 665), ruled that newsmen could be required to appear and testify before State and Federal Grand Juries and that such compulsory testimony did not violate the First Amendment. As noted in the case of Matter of Farber (supra, at pp 267-268), however, the Branzburg court did not leave the press without First Amendment protection: “Some of these are referred to by Justice White in the Branzburg opinion * * * They include, among others, the right to publish * * * to refrain from publishing what it chooses to withhold, to seek out news in any legal manner and to refrain from revealing its sources except upon legitimate demand. Demand is not legitimate when the desired information is patently irrelevant to the needs of the inquirer or his needs are not manifestly compelling. Nor will the First Amendment sanction harassment of the press. These do not exhaust the list of such First Amendment protective rights.”
In United States v Orsini (424 F Supp 229, 232, affd 559 F2d 1206, cert den 434 US 997), the Second Circuit held that there must be “a case by case evaluation and balancing of the legitimate competing interests of the newsman’s claim to First Amendment protection from forced disclosure of his confidential sources, as against the defendant’s claim to a fair trial which is guaranteed by the Sixth Amendment” and in Matter of Consumers Union of U. S. (495 F Supp 582, 586) it was held “[The] contention that the discovery is outside of First Amendment concern because it does not seek to identify confidential sources is a total misconception of the scope of the free press interest. Regardless whether they seek confidential sources, they seek to examine the reportorial and editorial process * * * *21 Such discovery would represent a substantial intrusion on fact gathering and editorial privacy which are significant aspects of a free press.”
In the recent case of United States v Burke (700 F2d 70), the court was faced with a fact pattern similar to that presented herein. The defendants in Burke were convicted of conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act (US Code, tit 18, § 1961 et seq.); conspiracy to commit sports bribery; and interstate travel with the intent to commit bribery. The convictions arose out of a “point-shaving” scheme in connection with the Boston College basketball team during the 1978-1979 season. Organized crime figures were implicated in the scheme.
The scandal was discovered when one Henry Hill, an associate of defendant Burke, was indicted in connection with State drug conspiracy charges. While being questioned with regard to the State charges, Hill revealed that he had taken part in a theretofore unknown point-shaving • scheme. He offered to implicate other participants in the scheme in exchange for Federal immunity and Federal intervention concerning the State charges. On February 16, 1981, prior to defendant’s trial, the magazine Sports Illustrated published an article entitled “How I Put The Fix In.” The article was written by Hill in conjunction with author Douglas Looney and purported to be Hill’s personal account of the point-shaving scheme.
Defense counsel served a subpoena upon Time, Inc., the parent company of Sports Illustrated, seeking production of virtually every document and tape relating to the article in the possession of Sports Illustrated. Time, Inc., moved to quash the subpoena, relying upon the “reporter’s privilege” embodied in the First Amendment, and also arguing that the broad-ranging request was unreasonable and unnecessary. Justice Bramwell quashed the subpoena with leave to renew after Hill had completed his trial testimony. The defense, as per Justice Bramwell’s ruling, renewed the subpoena request after Hill had completed testifying at trial. The court, noting that the request for the material was an attempt to secure impeachment material against Hill, quashed the subpoena. It ruled that the defendant *22 had not carried his burden of demonstrating that the subpoenaed material was “material and necessary to his case and not obtainable from other sources.”
The Second Circuit, in passing upon Justice Bramwell’s decision, held that the standard used in civil cases when a party seeks to subpoena a reporter’s documents in contravention of the reporter’s claimed First Amendment protection is equally applicable to criminal matters. Thus, “disclosure may be ordered only upon a clear and specific showing that the information is highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources” (supra, at pp 76-77). The purpose of this strict rule, as set forth in Baker v F & F Inv. (470 F2d 778, 782, cert den 411 US 966), is to “reflect a paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over . controversial matters, an interest which has always been a principal concern of the First Amendment”.
I conclude that defendant has failed to make a clear and specific showing that the subpoenaed information is highly material and relevant, is necessary or critical to the maintenance of his defense, and is not obtainable from other available sources. At this point in the proceedings, petitioner’s First Amendment protection from compulsory disclosure of the subpoenaed material outweighs defendant’s asserted speculative Sixth Amendment claim. Petitioner’s motion to quash must therefore also be granted upon Federal and State freedom of the press constitutional grounds.