OPINION OF THE COURT
Alexander, J.
The issue presented for our review in this case is whether the Shield Law (Civil Rights Law § 79-h) extends its protection to nonconfidential sources or information obtained in the course of gathering or obtaining news for publication. We hold that it does not.
I
In February 1986, Knight-Ridder’s television station in Albany — WTEN-TV—broadcast on its evening newscast portions of an interview with Donald Bent, whose wife had then been missing for several days. The interview had been conducted by a news team led by a reporter employed by the television *154 station. Approximately one minute of the taped interview was broadcast; the remainder of the interview has never been made public. It is not clear at this stage of the litigation what, if any, portions of the interview were conducted under a promise of confidentiality.
After Mrs. Bent was found dead in the trunk of an automobile, the District Attorney began a Grand Jury investigation into the death and Donald Bent became a suspect. In furtherance of the investigation, a subpoena duces tecum was served on WTEN demanding "all video tapes regarding an interview” with Donald Bent. In response to the subpoena, WTEN produced the video tape of the newscast along with the written introduction to the broadcast that had been read from the studio and a list of the "supers” that had appeared during the broadcast. The station declined to produce the nonbroadcast portions of the interview gathered by the news team during the preparation of the report.
Knight-Ridder then moved to quash the subpoena duces tecum, arguing alternatively that New York’s Shield Law (Civil Rights Law § 79-h) and the First Amendment to the United States Constitution provided a privilege as to the production of the requested material. Supreme Court, Albany County, granted the motion to quash, relying exclusively on the statutory ground. The Appellate Division reversed, holding that the Shield Law does not protect information not received in confidence, and accordingly remitted the matter to Supreme Court for an in camera inspection of the taped interview with Donald Bent to determine what portions, if any, of such interview were conducted confidentially (119 AD2d 68).[1] Subsequently, after we dismissed an appeal taken as of right (68 NY2d 997), the Appellate Division granted leave to appeal to this court on a certified question.[2]
*155 II
There can be no doubt that the Legislature in enacting and subsequently amending the Shield Law (Civil Rights Law § 79-h) has expressed a strong desire to safeguard the free channels of news communication (see, Matter of Beach v Shanley, 62 NY2d 241, 249-251; Oak Beach Inn Corp. v Babylon Beacon, 62 NY2d 158). In its deliberative process, the Legislature has presumably debated the efficacy of granting broad protection to the press, weighed competing policy considerations, and reached a formulation that in its view serves the best interest of the public. Whatever the view of this court may be as to the wisdom of the scope of the protection afforded by the statute, it may not substitute its view for that decided upon by the Legislature. Because the statute here, as enacted, interpreted and amended, clearly does not extend its protection to nonconfidential sources or information obtained in the course of gathering or obtaining news for publication, the Appellate Division correctly declined to quash the subpoena and the certified question must be answered in the negative.
New York’s Shield Law was enacted in 1970 in response, in part, to attempts by the Federal Government to compel the disclosure of confidential information and sought to protect newspersons from contempt charges for failing to disclose such information or its sources that were obtained during the news gathering process (Governor’s Mem, 1970 NY Legis Ann, at 508). In the years that followed, the appellate courts in every judicial department of this State were unanimous in ruling that the statute did not protect nonconfidential information (see, People v Le Grand, 67 AD2d 446 [2d Dept]; Matter of WBAI-FM v Proskin, 42 AD2d 5 [3d Dept], affg 68 Misc 2d 355; People [Fischer] v Dan, 41 AD2d 687 [4th Dept], appeal dismissed 32 NY2d 764, lv denied 32 NY2d 613; Matter of Wolf v People, 39 AD2d 864 [1st Dept], affg 69 Misc 2d 256). In reaching this conclusion, courts noted that the privilege must be strictly construed as it provides an exception to the fundamental duty of all citizens to disclose information to an authorized governmental body (Matter of WBAI-FM v Proskin, supra, at 7). Specifically rejected was the contention that since the statute does not explicitly state that the privilege applies only to confidential communications, no requirement of confidentiality exists. Indeed, it was pointed out that in signing the law, Governor Rockefeller cited the " 'real and imminent threat’ ” of requiring " 'the disclosure of information oh *156 tained by reporters in confidence’ ” (id., at 6, quoting 1970 NY Legis Ann, at 508 [emphasis supplied]). Further, it was recognized that the entire thrust of the Shield Law was aimed at encouraging a free press by shielding those communications given to the news media in confidence (id., at 9 [Cooke, J., dissenting]; Matter of Wolf v People, supra) and in this regard was similar to other privileges which are generally based on confidential relationships (Matter of WBAI-FM v Proskin, supra, at 7; Matter of Wolf v People, supra; see also, Matter of Andrews v Andreoli, 92 Misc 2d 410, 416-421).
In 1981, the Legislature sought to amend the statute to strengthen its protection for newspersons.[3] Among the provisions proposed was that the protection afforded by the law should apply whether or not the information was imparted under a cloak of confidentiality. Other proposed amendments sought to broaden the definition of the terms "professional journalist” and "news”, and sought to ensure that newspersons could not be held in contempt even if the material or the identity of the material’s source was highly relevant to a particular governmental inquiry and the information was not solicited by the newsperson before its disclosure to him. Although these latter proposals were included in the legislation that was approved by the Legislature and signed by the Governor, of significance here is that the proposal seeking to eliminate the confidentiality requirement, among other proposals, was deleted from the version of the bill that was ultimately approved.
After the passage of the 1981 amendments, the question whether the statute’s protection extended to nonconfidential information was again litigated and again, the unanimous appellate authority in this State concluded that the cloak of confidentiality requirement still obtained (see, People v Korkala, 99 AD2d 161 [1st Dept]; Hennigan v Buffalo Courier Express Co., 85 AD2d 924 [4th Dept]; see also, Matter of Pennzoil Co., 108 AD2d 666; People v Troiano, 127 Misc 2d 738; First United Fund v American Banker, 127 Misc 2d 247; People v Bova, 118 Misc 2d 14; contra, Wilkins v Kalla, 118 Misc 2d 34; People v Iannaccone, 112 Misc 2d 1057). In Korkala, the First Department noted that, in 1981 "the very *157 provision contained in the initial version of the bill that would have eliminated the 'cloak of confidentiality’ requirement for invoking the Shield Law was deleted from the version finally passed” and concluded that such development "persuasively suggests that the Legislature’s intent * * * was not to create an 'absolute privilege’ against disclosure” (99 AD2d 161, 165, 166, supra).
It is well settled that the legislative history of a particular enactment must be reviewed in light of the existing decisional law which the Legislature is presumed to be familiar with and to the extent it left it unchanged, that it accepted (Arbegast v Board of Educ., 65 NY2d 161, 169; Hammelburger v Foursome Inn Corp., 54 NY2d 580, 588; Engle v Talarico, 33 NY2d 237, 242). Where the interpretation of a statute is well settled and accepted across the State, it is as much a part of the enactment as if incorporated into the language of the act itself (Pouch v Prudential Ins. Co., 204 NY 281, 287; see, McKinney’s Cons Laws of NY, Book 1, Statutes § 72). Consequently, any intention to change such a well-established rule must emanate from the Legislature and may not be imputed to the Legislature in the absence of a clear manifestation of such intent (Hammelburger v Foursome Inn Corp., supra, at 592, citing Matter of Delmar Box Co. [Aetna Ins. Co.] 309 NY 60, 66). Especially is this so where the Legislature has acted upon a statute with knowledge of uniform judicial decisions interpreting the statute as then existing, a proposal is offered to rebut the interpretation, and the actions taken do not alter the judicial interpretation, for then the Legislature must be regarded as having legislated in the light of, and as having accepted, such interpretation (Engle v Talarico, supra, at 242; Orinoco Realty Co. v Bandler, 233 NY 24, 30; see, State of New York v Mobil Oil Corp., 38 NY2d 460, 465; RKO-Keith-Orpheum Theatres v City of New York, 308 NY 493, 500). Indeed, we have recently relied on unsuccessful attempts in the Legislature to amend a statute following our interpretation of the statute as evidence that our interpretation correctly reflected the intent of the Legislature (see, Matter of Bliss v Bliss, 66 NY2d 382, 389; see also, Heller v U. S. Suzuki Motor Corp., 64 NY2d 407, 411; New York State Bankers Assn. v Albright, 38 NY2d 430, 438). Thus, it is a recognized principle that where a statute has been interpreted by the courts, the continued use of the same language by the Legislature subsequent to the judicial interpretation is indicative that the legislative intent has been correctly ascertained (Matter of *158 Curtin v City of New York, 287 NY 338, 342; Matter of Gilmore v Preferred Acc. Ins. Co., 283 NY 92, 97; Transit Commn. v Long Is. R. R. Co., 253 NY 345, 354-355). The underlying concern, of course, is that public policy determined by the Legislature is not to be altered by a court by reason of its notion of what the public policy ought to be (Hammelburger v Foursome Inn Corp., supra, at 592; see, Waddey v Waddey, 290 NY 251, 256; cf., Flanagan v Mount Eden Gen. Hosp., 24 NY2d 427, 436 [Breitel, J., dissenting]).[4]
Consideration of all the circumstances surrounding the 1981 amendment to the Shield Law leads inexorably to the conclusion that the Legislature, by considering and rejecting an explicit provision addressing the issue facing the court today, did not intend the Shield Law to create an "absolute privilege” against disclosure. That the 1981 amendments did not alter the established requirement of confidentiality was noted by the Attorney-General who, in analyzing the 1981 amendment at the time of its enactment, specifically remarked that the legislation did not protect journalists when the requested information was not confidential (Mem of Attorney-General, July 8, 1981, Governor’s Bill Jacket, L 1981, ch 468). Of course, the opinion of the Attorney-General as to the scope of the statute is not binding on this court, nor is it dispositive of the intent of the Legislature. Nevertheless, it can hardly be dismissed as "essentially irrelevant in this case” (dissenting opn, at 166). To the contrary, we have long recognized that a contemporaneous interpretation of a statute is entitled to considerable weight in discerning legislative intent and have specifically relied in this respect on correspondence in the Bill Jacket from the Attorney-General (see, e.g., Matter of Niagara Mohawk Power Corp. v Public Serv. Commn., 69 NY2d 365, 374; see also, Shiles v News Syndicate Co., 27 NY2d 9, 20 [Breitel, J., dissenting]; McKinney’s Cons Laws of NY, Book 1, Statutes § 128). All the more relevant is the opinion of the *159 Attorney-General in this case for nothing else in the Governor’s Bill Jacket concerning the 1981 amendments discusses the confidentiality requirement. The legislative history relied on by the dissent is confined exclusively to the Memorandum prepared by the legislative sponsor (see, dissenting opn, at 164, citing 1981 Legis Ann, at 257-258). Certainly, it is true, as the sponsor’s Memorandum makes clear, that the proposed amendments sought to persuade the Legislature to overrule prior court decisions requiring a cloak of confidentiality. The views of one legislator, however, are not necessarily revealing of the legislative intent (see, Matter of Delmar Box Co. [Aetna Ins. Co.], 309 NY 60, 67, supra; Matter of Morse [Bank of Am.] 247 NY 290, 302-303; Woollcott v Shubert, 217 NY 212, 221); rather, the dispositive fact here is that the Legislature adopted an amendment which on its face does not address confidentiality but did address other concerns about the scope of the statute. Thus, despite the clear attempt by the sponsor to alter the settled rule, the Legislature did not accept the sponsor’s recommendation, and in so doing confirmed the prior court decisions requiring confidentiality as a prerequisite to protection under the Shield Law. In sum, the long-standing interpretation of the Shield Law should not be judicially abrogated where the Legislature has considered that interpretation and explicitly declined to amend the statute to overcome it.
Moreover, it is worth noting that the confidentiality requirement, which has been the settled law of this State for over a decade, is consistent with the legislative history surrounding the enactment of the Shield Law in 1970. In fact, the Bill Jacket before Governor Rockefeller is replete with references to the importance of protecting reporters’ confidential sources and information.[5] In any event, whether or not the Legislature created the confidentiality requirement in 1970 is not dispositive for such a requirement became the well-settled law by 1981 and the Legislature’s refusal to repudiate that interpretation, despite an explicit proposal to that effect, is compellingly persuasive evidence of the legislative intent. Nor is the fact that this court had never decided the issue entitled to *160 great weight in determining the legislative intent in 1981. In fact, the Legislature was aware in 1981 that the controlling authority in every judicial department in this State required confidentiality; indeed, it was for this reason that the sponsor of the proposed amendment sought to amend the statute. Under these circumstances, the failure of the Legislature to adopt the proposed amendment abrogating the confidentiality requirement is persuasive evidence of the legislative intent.[6]
III
In regard to the constitutional claims raised by KnightRidder, we agree with the Appellate Division that whatever qualified privilege may exist under the First Amendment to the United States Constitution does not protect the material sought here since the taped interview presumably contains relevant information necessary to the Grand Jury investigation and unavailable from other sources (see, Branzburg v Hayes, 408 US 665, 710; People v Korkala, 99 AD2d 161, 166-168, supra). Any claims under the State Constitution are not preserved for our review (People v Lancaster, 69 NY2d 20, 31).
IV
Based on the foregoing, the order of the Appellate Division should be modified, with costs, to the extent of dismissing the motion because of mootness and the certified question answered in the negative.

. The Appellate Division also found no merit to Knight-Ridder’s First Amendment claim.

. The Appellate Division certified the following question: "Did this court err in reversing Supreme Court’s order and remitting the matter to the Supreme Court for an in-camera inspection of the taped interview with Donald Bent to determine what portions, if any, of such interview, were conducted confidentially?” Although Donald Bent was indicted subsequent to the Appellate Division decision, and the questions presented by this appeal are thus moot, the case is one which should be preserved as an exception to the mootness doctrine (see, Matter of Hearst Corp. v Clyne, 50 NY2d 707; Matter of Gannett Co. v De Pasquale, 43 NY2d 370, 381).

. In 1975, the Legislature had amended the statute by adding a provision which gave the news media immunity from disclosing sources of information in Grand Jury appearances. Further attempts at extending the scope of the statute in 1979 were not reported out of committee.

. The dissent’s reliance on the familiar axiom that in construing a statute, a court should look first to the particular statutory language and be guided by its natural and most obvious meaning (dissenting opn, at 162) is misplaced. Such an approach fails to recognize that where a court is faced with a long-standing interpretation of a statute, a vigorous attempt to legislatively amend the settled interpretation, and the legislative renunciation of such attempt, the absence of facial ambiguity is not conclusive; rather "[s]ound principles of statutory interpretation * * * require examination of a statute’s legislative history and context to determine its meaning and scope” (New York State Bankers Assn. v Albright, 38 NY2d 430, 434; see, Uniformed Firefighters Assn. v Beekman, 52 NY2d 463, 471).

. See, e.g., letter of New York State Publishers Association, Apr. 22, 1971; mem of New York State Broadcasters Association, May 9, 1970; letter of WCBS, Apr. 30, 1970; letter of WNEW-TV, May 11, 1970; affidavit of Walter Cronkite, Apr. 1, 1970; affidavit of Mike Wallace, Mar. 31, 1970; affidavit of Dan Rather, Mar. 31, 1970, all contained in the Governor’s Bill Jacket, L 1970, ch 615.

. Neither of our recent decisions in Matter of Beach v Shanley (62 NY2d 241) or Oak Beach Inn Corp. v Babylon Beacon (62 NY2d 158) is inconsistent with the confidentiality requirement as confidentiality was not at issue in either case and as we have long recognized, "principles are not established by what was said, but by what was decided, and what was said is not evidence of what was decided, unless it relates directly to the question presented for decision” (People ex rel. Metropolitan St. Ry. Co. v State Bd. of Tax Commrs., 174 NY 417, 447; see, People v Bethea, 67 NY2d 364, 368, n).