OPINION OF THE COURT
Robert F. Doran, J.
At issue in this CPLR article 78 proceeding is the disposition of surcharge revenues collected by the Capital District *895 Regional Off-Track Betting Corporation (hereinafter Capital OTB) from the nonsimulcast handle generated from races conducted at the Finger Lakes Racetrack (hereinafter Finger Lakes). Finger Lakes is located in Ontario County and is not within a city having a population in excess of 100,000. Capital OTB is a regional off-track betting corporation and is a body corporate and politic constituting a public benefit corporation (Racing, Pari-Mutuel Wagering and Breeding Law § 502 [1]). Capital OTB encompasses a geographical territory of 21 counties, 16 of which are participating counties (Racing, Pari-Mutuel Wagering and Breeding Law § 519 [1] [e]).
The New York State Racing and Wagering Board (hereinafter Board) is a board created within the Executive Department of New York State, which Board has general jurisdiction over all horse racing activities and all pari-mutuel betting activities, both on-track and off-track, in New York State and also over the corporations, associations and persons engaged therein (Racing, Pari-Mutuel Wagering and Breeding Law § 101 [1]).
The total surcharge on off-track winnings is 5% of the portion of pari-mutuel wagering pools distributed to bettors at off-track betting facilities (Racing, Pari-Mutuel Wagering and Breeding Law § 532 [1]). Prior to July 1, 1985, and pursuant to Racing, Pari-Mutuel Wagering and Breeding Law § 532 (3) (a), 50% of the surcharge moneys on off-track pools for winners was distributed to those cities or counties entitled to receive revenues from regional off-track betting corporations pursuant to section 516 of the Racing, Pari-Mutuel Wagering and Breeding Law or to an off-track betting operator; the balance, the other 50%, was distributed in accordance with Racing, Pari-Mutuel Wagering and Breeding Law § 532 (3) (b). Since Finger Lakes is not located within a city with a population in excess of 100,000, the second 50% of the surcharge moneys Collected by Capital OTB on races from Finger Lakes was to be distributed to Ontario County pursuant to Racing, PariMutuel Wagering and Breeding Law § 532 (3) (b) (ii).
Laws of 1984 (ch 363) authorized the simulcasting of horse races. Initially, the simulcasting was to be on an experimental basis from July 1, 1984 through June 30, 1985. By Laws of 1985 (ch 286, § 45), the experiment was extended through June 30, 1990. The simulcasting provisions are contained in article X of the Racing, Pari-Mutuel Wagering and Breeding Law.
*896 Laws of 1985 (ch 286, § 29) also amended the surtax distribution provisions of Racing, Pari-Mutuel Wagering and Breeding Law § 532 by amending paragraph (b) of subdivision (3) of section 532 of such law by adding a new clause (v), which reads as follows: "(v) where the track conducting the race is located in a thoroughbred special betting district and is simulcasting pursuant to section one thousand eight of this chapter outside such special betting district, ninety per centum to the off-track betting operator and ten per centum to the county in which such track is located.” The effective date of Laws of 1985 (ch 286) was July 1, 1985.
Since July 1, 1985, Capital OTB has been retaining 90% of all of the second 50% of surcharge moneys generated from races at Finger Lakes and distributing the other 10% to Ontario County.
Capital OTB has been calculating that 90-10 distribution based on the total amount of surtax on off-track winnings pools from races at Finger Lakes, whether the surtax was generated from branches of Capital OTB which simulcast or from those branches which do not simulcast. Capital OTB currently has 53 branch offices, with 42 of those branches displaying simulcast races from the Finger Lakes and 11 branches offering wagering opportunities on Finger Lakes races without simulcasting the races.
It is the contention of the petitioner, Ontario County, that the 90-10 distribution of the second 50% of the surtax moneys should apply only to the surtax moneys being generated from the 42 branches which simulcast. Ontario County claims that it should receive the full second 50% of the surtax moneys being generated from the 11 branches which offer wagering opportunities at Finger Lakes races without simulcasting the races.
To set forth in dollars and cents what is at stake in this proceeding, the court has, from the papers provided, generated the following example. Attached to the answer of Capital OTB is exhibit A, which is a computer printout prepared by Capital OTB. The printout reveals the total net handle by Capital OTB generated from races conducted at Finger Lakes for the period April 1, 1988 through March 31, 1989. The total net handle for that period was $27,223,624, of which $3,842,958 was generated from the net nonsimulcasting handle. The surcharge calculations are based on the winning pools, which are calculated by subtracting the tax mandated by Racing, *897 Pari-Mutuel Wagering and Breeding Law § 527. Because that tax varies with the type of bet — anywhere from 17% on regular bets to 36% on super exotic bets, plus the breakage— the court has used 18% as an over-all tax figure to be deducted from the total net handle before the surtax imposed by Racing, Pari-Mutuel Wagering and Breeding Law § 532 is calculated. Multiplying $3,842,958 X 82% generates a net figure for purposes of the surtax calculation of $3,151,225.56. Multiplying the $3,151,225.56 by .025 generates a surtax to be distributed according to Racing, Pari-Mutuel Wagering and Breeding Law § 523 (3) (b) of $78,780.64. Presently, petitioner Ontario County is receiving $7,878.07 of that amount. The balance is going to Capital OTB. Petitioner asserts that it should receive the full $78,780.64. (The court has asked the parties for verification of its example, and all agree that it is reasonably accurate. However, the Attorney-General’s Office feels that $81,663 would be a more accurate figure than the $78,780.64 figure of the court.)
 Before reaching the merits of this proceeding, the court must first address two affirmative defenses of Capital OTB which state that the petition is barred by the Statute of Limitations for CPLR article 78 proceedings and that petitioner is equitably estopped from maintaining the present proceeding. The court concludes that the Statute of Limitations does not bar the proceeding and that petitioner is not estopped from commencing this proceeding.
Capital OTB premises the Statute of Limitations argument on the fact that the Director of Planning and Policy of the Board, in a letter of February 18, 1987 addressed to the Comptroller of Capital OTB, stated that the 1985 amendment "now directs that of the 50% of the surtax ordinarily paid to Ontario County, that 90% thereof (i.e. 90% of 50%) shall remain with the 'off-track betting operator’ and only 10% thereof (i.e. 10% of 50%) shall be remitted to Ontario County.” The February 18, 1987 letter was in response to a letter request from Capital OTB dated January 27, 1987 to have some clarification as to how Capital OTB could treat such 90% of the second 50% of the surcharge. Capital OTB would have the court use February 18, 1987, the date of the letter, as the controlling date for the commencement of the running of the Statute of Limitations. The court does not find that date controlling. Ontario County had no knowledge of the letter. Moreover, it should be noted that the Board never promulgated any rules or regulations to the effect that the off-track *898 betting operator would get 90% of the second half of the surcharge moneys as a result of the 1985 amendment.
Capital OTB also argues that the actual knowledge on the part of Ontario County that it was receiving only 10% of the second half of the surcharge moneys was sufficient to commence the running of the Statute of Limitations. Capital OTB cites a letter from it to the Ontario County Finance Officer dated December 18, 1986 and argues that it should have been clear to Ontario County then that it was receiving only the 10% and, thus, that any proceeding challenging that type of distribution should have been made at least within four months of the receipt of that letter in 1986. The court does not agree with Capital OTB. Rather, the court determines that the controlling date for the purposes of the commencement of the running of the four-month Statute of Limitations is February 23, 1989, the date that petitioner received notice by way of a "fax” letter from the Board that the letter of February 18, 1987 was formally adopted as the official interpretation and opinion of the Board. The February 18, 1987 letter was adopted as the official interpretation and opinion at a meeting of the Board held on February 23, 1989 which considered the petition of Ontario County for a determination in its dispute as to the distribution of the moneys. The petition of Ontario County was contained in a letter to the Board dated January 11, 1989.
In addition to the affirmative defense of equitable estoppel in its answer, Capital OTB, in paragraph 16 of the affidavit in support by Philip Stillman, Esq., also alleges that petitioner is guilty of laches and that any grant of the relief requested in this proceeding would financially prejudice Capital OTB. Capital OTB cites Matter of Elefante v Hanna (40 NY2d 908) to support its position.
Assuming, first, that Capital OTB is relying on the affirmative defense of estoppel, the court concludes that it is referring to the doctrine of equitable estoppel. Clearly, the facts here do not sustain the essential elements of the doctrine of equitable estoppel. There was no act on the part of petitioner which would constitute any concealment of facts or false representations. There was no reliance by an innocent party (Capital OTB) causing it to change its position to its detriment. Indeed, the exchange of letters between the Finance Officer of Ontario County and Capital OTB reveals that it was Capital OTB from the very beginning that was using the 90-10 formula.
*899 "The law does not withdraw its remedies from a person against whom a wrong is committed merely because he is silent and without complaint recognizes and endures the wrong. Estoppel becomes available in such cases only when the failure to assert a right has given rise to circumstances rendering it inequitable to permit the exercise of the right after a lapse of time. Clearly, the fact that a party has on other occasions omitted to enforce his legal rights as to some property affords no reason why he should be defeated as to legal claims upon other property, when he does finally assert them. And a failure to initially complain does not estop one from objecting to the defendant’s actions that increase the injury done. However, laches or limitations may preclude the enforcement of legal rights” (57 NY Jur 2d, Estoppel, Ratification, and Waiver, § 27).
Insofar as any defense of laches is concerned, Capital OTB raises that defense only in the 16th paragraph of the affidavit by its attorney, Mr. Stillman, in support of the motion to dismiss.
"The common-law rule is that laches cannot be imputed to a sovereignty, and that the equitable doctrine of laches may not be interposed as a defense against a state when acting in a governmental capacity to enforce a public right or protect a public interest. And laches may not be imputed to the state in the absence of statutory authority. But the defense is available * * * where the government acts in its private or proprietary capacity” (75 NY Jur 2d, Limitations and Laches, § 331). Here, petitioner Ontario County is acting to enforce a public right or interest and is not acting in any private or proprietary capacity. It is merely attempting to obtain on behalf of. its residents all the moneys it believes are due it from one source of revenue — i.e., the surtax moneys that belong to it pursuant to Racing, Pari-Mutuel Wagering and Breeding Law § 532 (3) (b).
The court accordingly concludes that neither the Statute of Limitations, equitable estoppel nor laches prevents petitioner from bringing this proceeding. (It should be noted that part of the relief sought in the proceeding is an accounting by Capital OTB and payment of all past due money allegedly owed Ontario County by Capital OTB. The court wonders whether this relief could not be, or indeed must be, sought in an accounting action between Ontario County and Capital OTB which would be subject to the Statute of Limitations provi *900 sions of CPLR 213. In the context of the current proceeding, however, that question will be neither addressed nor answered.)
Turning to the merits of the proceeding, the court concludes that the petition must be dismissed. The petition seeks a final judgment annulling the February 23, 1989 determination of the Board,. directing the Board to order Capital OTB to retain 90% of the second 50% of the surcharge revenues only from those betting locations which display simulcast and to allocate surcharge revenues to Ontario County from nonsimulcast betting locations of the Capital OTB on a 100% basis and directing the Board to order Capital OTB to account for excess revenues it may have retained since July 1, 1985 and pay the same to Ontario County.
Petitioner alleges that the Board’s determination fails to comport with the intent of the Legislature in enacting Racing, Pari-Mutuel Wagering and Breeding Law § 532 (3) (b) (v). Petitioner also contends that the Board’s determination is not entitled to judicial deference.
The court agrees with the petitioner that clauses (ii) and (v) of Racing, Pari-Mutuel Wagering and Breeding Law § 532 (3) (b) should be read together and that they are in pari materia and are to be construed together. Clearly, clause (v) did not repeal clause (ii). Clause (ii) still applies, for example, to the entire handle being generated from bets on Finger Lakes races being placed within all locations in a thoroughbred special betting district, whether those locations have simulcasting or not. This is so because the new 90-10 split pursuant to clause (v) applies only to simulcasting outside such special betting district. The thoroughbred special betting district — the only such district in New York State — consists of the Counties of Orleans, Genesee, Wyoming, Allegany, Monroe, Livingston, Steuben, Wayne, Ontario, Yates, Seneca, Schuyler, Cayuga, Tompkins, Onondaga and Cortland (Racing, Pari-Mutuel Wagering and Breeding Law § 523 [5]).
However, it seems clear to the court that, where an operator is simulcasting pursuant to section 1008 of the Racing, Pari-Mutuel Wagering and Breeding Law, the Legislature intended that that operator receive 90% of the entire handle from Finger Lakes races, provided the simulcasting takes place outside the territorial limits of the thoroughbred special betting district. An operator is defined as any association or corporation operating a simulcast facility (Racing, Pari-Mutuel Wagering and Breeding Law § 1001 [el, [fl).
*901 This court holds that the language mandates such a 90-10 division once an operator starts simulcasting. Petitioner makes the point that the 90-10 division does not apply to the Nassau Regional Off-Track Betting Corporation (hereinafter Nassau OTB). However, there is nothing inconsistent with this court’s ruling and the fact that the Nassau OTB still distributes 100% of the second 50% of the surcharge generated on Finger Lakes races to Ontario County. Clause (v) is triggered only when an operator does any simulcasting. Nassau OTB does not simulcast any Finger Lakes races within its region.
Most importantly, this court is of the opinion that the whole area of the relationship between municipalities, off-track betting operators, and racing associations and corporations is a highly complicated and complex one. For example, the simulcast provisions call for a written agreement between a sending track such as Finger Lakes and a regional off-track betting corporation such as Capital OTB (Racing, Pari-Mutuel Wagering and Breeding Law § 1008 [2]). The record reveals that Capital OTB is paying $300,000 a year to Finger Lakes pursuant to such an agreement.
Here, from all the data submitted by the parties, including recent letters, the court concludes that the interpretation of the 1985 amendment to Racing, Pari-Mutuel Wagering and Breeding Law § 532 involves a knowledge and understanding of the underlying operational practices and problems of simulcasting. The situation is not one of pure statutory reading and analysis depending only on an accurate apprehension of legislative intent; rather, this is a situation where the court should defer to the governmental agency charged with the responsibility of administering the statute. That agency is the Board. Unless the Board’s interpretation of the 1985 amendment is irrational or unreasonable, it should be upheld (Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451, 459; Matter of Burger King v State Tax Commn., 51 NY2d 614, 621). This court concludes that the Board’s determination of February 23, 1989 is not irrational or unreasonable. Moreover, the Board’s interpretation does not run counter to the clear wording of clause (v) when read in pari materia with clause (ii).
The court, on its own, requested copies of materials in the Governor’s Bill Jackets for Laws of 1984 (ch 363) and Laws of 1985 (ch 286) and also the transcript of any debates on those laws. There is nothing in any of that material which assists in the making of the decision in this proceeding.
*902 Petitioner has submitted the record of proceedings that occurred on June 30, 1989 on Assembly Bill 8778. In that debate, there is some discussion to the effect that the interpretation sought by petitioner is the correct one. In the debate, a request was made that an amendment to A 8778 be made to make it clear that petitioner’s position is the correct one. That bill was going to extend the sunset provision of the surcharge provisions of section 532 of the Racing, Pari-Mutuel Wagering and Breeding Law to a point beyond their expiration date of July 1, 1989. However, no such amendment was in fact made. Assembly Bill 8778 was enacted into law as Laws of 1989 (ch 248).
Petitioner would have the court use the language in the debate as legislative intent that the 1985 amendment should be interpreted as set forth by petitioner. First, legislative debates are not looked upon highly in interpreting statutes (Woollcott v Shubert, 217 NY 212, 221; Matter of Knight-Ridder Broadcasting v Greenberg, 70 NY2d 151, 159). Second, and even more important, is the fact that the Legislature in 1989 became aware of petitioner’s position but failed to act to change the law so that petitioner would receive the moneys it claims are due it.
Respondents may submit a judgment dismissing the petition, with costs and disbursements.