OPINION OF THE COURT
Rose H. Sconiers, J.
The moving party, Buffalo Broadcasting Co., Inc., has moved *719 to quash a subpoena duces tecum which was served upon them by the Erie County District Attorney’s office on May 17, 1991 requesting the production of the "videotape of May 15, 1991 sting operation by the Buffalo Police Vice Department.”
On May 15, 1991, WIVB-TV, Channel 4 in Buffalo, New York filmed certain aspects of a Buffalo Police Department sting operation involving an escort service as part of the station’s undercover investigative series. The investigation of the escort service was conducted and reported by Richard Pfeiffer, a professional journalist employed by WIVB. The report was aired on the 11:00 p.m. news on WTVB on May 15, 1991.
As a result of the sting operation, two women have been charged with prostitution pursuant to Penal Law § 230.00. During their investigation of the incident, the Erie County District Attorney’s office served a subpoena duces tecum upon WIVB.
In response, Buffalo Broadcasting Co., Inc., the owner of WIVB, has moved to quash the subpoena duces tecum pursuant to Civil Rights Law § 79-h (b), (c), the "Shield Law.”
Aside from the broadcast tape of May 15, 1991 (which WIVB is willing to produce), WIVB has one videotape containing outtakes. "Outtakes” are those portions of film which are recorded as part of the journalist’s investigation but which are not ultimately broadcasted on the air. This videotape of "outtakes” runs 10 minutes and 30 seconds.
The movant states that the videotape contains film of undercover officers conducting parts of the sting operation. WIVB reporter, Richard Pfeiffer, promised the undercover officers confidentiality in exchange for their agreement to be filmed. If film of the undercover officers was to be shown, Pfeiffer promised to mask their identities.
The moving party asserts the Shield Law in support of its motion to quash the subpoena duces tecum. The Shield Law provides absolute immunity to a newsperson who refuses to disclose unpublished confidential news information. (Civil Rights Law § 79-h [b].) In addition, the statute provides a qualified privilege to a newsperson who refuses to disclose unpublished nonconfidential news information. (Civil Rights Law § 79-h [c].)
In order to ascertain which portions of the tape, if any, would be protected from disclosure by the Shield Law, the court viewed in camera the entire videotape that is the subject *720 of this proceeding. The first 4 minutes and 30 seconds of the tape contains film of undercover officers conducting parts of the sting operation and taking two suspects into custody. The next 2 minutes and 20 seconds of the videotape contains an interview with an undercover police officer. The next 29 seconds of the tape contains a picture of the husband of an escort service owner together with one of the escorts. The final 2 minutes and 11 seconds of the tape shows scenery shots of downtown Buffalo.
At the hearing, counsel for Buffalo Broadcasting Co., Inc. called Detective Sugg to testify. He is the undercover officer shown on the videotape during the sting operation and he was also interviewed by Pfeiffer. Upon taking the stand, Detective Sugg waived the confidentiality that was afforded to him at the time the report was filmed. At this point, the People claimed that none of the information regarding the sting operation contained in the outtake videotape was privileged. Counsel for the movant opposed this argument and claimed that the information would now be deemed nonconfidential and would be subject to the qualified protection contained in Civil Rights Law § 79-h (c).
The court then permitted counsel for the moving party to examine Detective Sugg pursuant to the three-pronged test found in Civil Rights Law § 79-h (c) with reference to the confidential portion of the videotape as well as the nonconfidential portion. The officer was permitted to view the confidential portion of the videotape in camera.
Thereafter, Detective Sugg testified that he could not state that the information in the outtake videotape is highly material and relevant, nor that it is critical or necessary to the maintenance of the People’s case. In addition, Detective Sugg stated that he would voluntarily give the People the information that was necessary to maintain their case.
The question presented is whether a waiver of confidentiality of material protected under Civil Rights Law § 79-h (b) causes that previously confidential material to become nonconfidential material pursuant to section 79-h (c) of said law and thereby subject to the three-pronged test required by that statute.
The People argue that when Detective Sugg waived the confidentiality as to the first 7 minutes and 50 seconds of the videotape in order to remove that portion’s absolute protection under Civil Rights Law § 79-h (b), this information became wholly unprotected and subject to disclosure. Therefore, the *721 People claim that the subpoena must not be quashed with respect to the confidential portion of the tape because the absolute privilege was lost when the police officer waived confidentiality.
The moving party opposes this argument and responds that once Detective Sugg waived confidentiality, the qualified privilege of Civil Rights Law § 79-h (c) then applies. In order to defeat this qualified privilege, the People must make a clear and specific showing that the news is highly material and relevant; is critical or necessary to the maintenance of the People’s claim, defense or proof of a material issue; and is not obtainable from any alternative source. They argue that the People have failed to meet this burden and the subpoena duces tecum should be quashed.
This issue appears to be a case of first impression since the amendment of the Shield Law in 1990.
The history of the Shield Law can be traced to Branzburg v Hayes (408 US 665 [1972]), where the Supreme Court concluded that the First Amendment to the Federal Constitution does not accord a newsperson a privilege against appearing before a Grand Jury and answering questions as to either the identity of their news sources or information they have received in confidence. Nevertheless, the court made it clear that there is merit in leaving State Legislatures free, within First Amendment limits, to fashion their own standards.
New York’s "Shield Law” was first enacted by the State Legislature in 1970 as Civil Rights Law § 79-h. The law was amended in 1975 (L 1975, ch 316) and again in 1981 (L 1981, ch 468). However, the scope of the Shield Law remained unclear and was subject to various judicial interpretations over the years.
One interpretation of the law prior to the 1990 amendment is found in Matter of Knight-Ridder Broadcasting v Greenberg (119 AD2d 68, mod on other grounds 70 NY2d 151 [1987]) where the court held that the Shield Law only protected news material which had been imparted to a newsreporter under a cloak of confidentiality.
In response to the confusion over the extent of the privilege, the Legislature enacted the current law which now defines two separate categories of the privilege: absolute protection for confidential news (Civil Rights Law § 79-h [b]), and qualified protection for nonconfidential news (Civil Rights Law § 79-h[c]).
*722 The absolute privilege applies to unpublished news that is received in confidence in the course of gathering or obtaining news for publication. In such a case, the newsperson shall not be held in contempt by a court: "[F]or refusing or failing to disclose any news obtained or received in confidence or the identity of the source of any such news coming into such person’s possession in the course of gathering or obtaining news for publication” (Civil Rights Law § 79-h [b]).
The qualified privilege applies to any unpublished news obtained or prepared by a newsperson in the course of gathering or obtaining news which was not obtained in confidence. In such a case, the newsperson shall not be held in contempt by a court: "[F]or refusing or failing to disclose any unpublished news obtained or prepared by a journalist or newscaster in the course of gathering or obtaining news * * * or the source of any such news, where such news was not obtained or received in confidence, unless the party seeking such news has made a clear and specific showing that the news: (i) is highly material and relevant; (ii) is critical or necessary to the maintenance of a party’s claim, defense or proof (a material issue); and (iii) is not obtainable from any alternative source” (Civil Rights Law § 79-h [c]).
If this premise was accepted, news which was originally confidential and entitled to an absolute privilege would then have less protection than news which from the outset was never confidential. This proposition would result in a further intrusion upon the news media and would undermine the intent behind the 1990 amendment to the Shield Law.
The legislative history of Civil Rights Law § 79-h indicates that the 1990 amendment was enacted to "strengthen New York’s Shield Law” and: "[T]o advance First Amendment values by protecting journalists from improper requests for information or disclosure of sources. * * * In recent years, decisions of the Court of Appeals have raised questions about the scope of the Shield Law. This [amendment] resolves those questions in favor of a free and unfettered press.” (Governor Cuomo’s mem of support on approving L 1990, ch 33, 1990 McKinney’s Session Laws of NY, at 2693.) The legislation was intended to apply to all unpublished news information and sources obtained in the course of news gathering. The distinction in the scope of the privilege was made by determining whether the information was obtained in a confidential or nonconfidential manner.
The State Executive Department memorandum to the 1990 *723 amendment also addressed the need to settle the conflicting interpretations of New York State’s Shield Law: "Journalists, however, encounter the most problematic incursions into the integrity of the editorial process when they are drawn into the criminal justice system merely because they have reported on a crime. They run the risk of being used as investigative agents of the government or the defense. The need for protection of non-confidential information and sources is thus greatest in criminal cases. Accordingly, the bill codifies the Shield Law, the three-part test adapted in [O’Neill v Oakgrove Constr., 71 NY2d 521 (1988)] and makes clear that the same test applies in criminal proceedings.” (1990 McKinney’s Session Laws of NY, at 2332.)
This concern was earlier articulated by Judge Bellacosa in his dissent in Matter of Knight-Ridder Broadcasting v Greenberg (supra, at 168) when he stated: "I believe it is unwise for the judiciary to transmogrify newspeople into agents of the government to collect evidence.”
If this court adopted the argument by the People in this case, the effect would be that newspersons would indeed become agents of the government when law enforcement officials, who have imparted news information, decide to waive confidentiality. However, neither the statute nor the legislative history of the current Shield Law supports the People’s argument.
Instead, the statute and the legislative history of the 1990 amendment indicate that the intent of the amendment was to strengthen the independence of the press in its efforts to gather and disseminate information to the public. Therefore, the protection against disclosure was expanded to include unpublished nonconfidential news information as well as unpublished confidential news information.
Nevertheless, a party seeking disclosure of unpublished, nonconfidential news information may obtain disclosure upon a clear and specific showing of the requirements contained in Civil Rights Law § 79-h (c).
In this case, the court holds that the waiver of confidentiality of material protected under Civil Rights Law § 79-h (b) resulted in that material becoming nonconfidential material subject to the qualified privilege pursuant to Civil Rights Law § 79-h (c). The waiver of confidentiality by Detective Sugg did not cause this information to become wholly unprotected and subject to disclosure.
*724 The 1990 amendment was intended to protect all unpublished news information obtained in the course of news gathering. The distinction in the scope of the privilege is whether or not the material is confidential. If the material does not fall within the scope of the absolute privilege for confidential information, then it falls within the scope of the qualified privilege and is then subject to the three-pronged test contained in Civil Rights Law § 79-h (c).
Since the material contained in the videotape is subject to the qualified privilege, the People may in fact obtain disclosure if they make a clear and specific showing that the news is highly material and relevant; is critical or necessary to the maintenance of the People’s claim, defense or proof of a material issue; and is not obtainable from any alternative source. (Civil Rights Law § 79-h [c].)
As previously mentioned, this court did hold an evidentiary hearing in order to allow the People to demonstrate whether or not the videotape should be disclosed to them based upon the three-pronged test. The People’s witness, Detective Sugg, testified that he could not state that the information in the outtake videotape is highly material and relevant nor that it is critical or necessary to the People’s case. He also stated that he would voluntarily give the People the information that was necessary to maintain their case.
It is evident to the court that the People have failed to make a clear and specific showing of the requirements in the three-pronged test contained in Civil Rights Law § 79-h (c) and therefore, Buffalo Broadcasting Co., Inc. shall not be ordered to disclose this information to the People.
The motion to quash the subpoena duces tecum is hereby granted.