Smith, J.
(dissenting). Because Arts and Cultural Affairs Law § 12.03 encompasses only civil processes and because a subpoena duces tecum by the District Attorney in this case was proper, I dissent.
Facts & Procedural History
In 1997, the Leopold Foundation of Vienna loaned the Museum of Modern Art (Museum) 150 paintings by Egon Schiele, an Austrian expressionist painter, for a Schiele retrospective hosted by the Museum. Among the paintings exhibited were “Portrait of Wally” and “Dead City III.” Prior to World War II, Lea Jar ay Bondi and Fritz Grunbaum owned “Portrait of Wally” and “Dead City III,” respectively. During the Nazi annexation of Austria, however, both paintings were allegedly stolen or otherwise misappropriated by Nazi agents or collaborators.
During the last days of the Schiele exhibit in New York, heirs of Bondi and Grunbaum contacted the Museum to inform it that the two paintings were stolen and that neither the Bondi nor the Grunbaum heirs had ever consented to the sale or transfer of the paintings. Both the Bondi and Grunbaum heirs requested that the Museum keep the paintings in the jurisdiction until the matter of true ownership was resolved. While sympathetic to the issues raised by the heirs of both families, the Museum declined to retain the paintings, indicating that it was under a contractual obligation to return them.[1]
In January 1998, just before the Schiele exhibit was scheduled to be shipped to its next place of exhibition, the New York County District Attorney’s office (the People) served the *743 Museum with a subpoena duces tecum directing the Museum to appear before a Grand Jury and to produce “Portrait of Wally” and “Dead City III.” In response, the Museum moved to quash the subpoena.
Supreme Court, New York County, granted the Museum’s motion, concluding that Arts and Cultural Affairs Law § 12.03 unambiguously prohibits “any kind of seizure” that would interfere with works of art on loan from out-of-State, including the subpoena at issue here. The Appellate Division, First Department, unanimously reversed and denied the Museum’s motion.
Relevant Statute
Section 12.03 of Arts and Cultural Affairs Law states:
“No process of attachment, execution, sequestration, replevin, distress or any kind of seizure shall be served or levied upon any work of fine art while the same is enroute to or from, or while on exhibition or deposited by a nonresident exhibitor at any exhibition held under the auspices or supervision of any museum, college, university or other nonprofit art gallery, institution or organization within any city or county of this state for any cultural, educational, charitable or other purpose not conducted for profit to the exhibitor, nor shall such work of fine art be subject to attachment, seizure, levy or sale, for any cause whatever in the hands of the authorities of such exhibition or otherwise.”
Merits
The Museum argues, and the majority agrees, that the term “seizure,” as used in section 12.03, encompasses both civil and criminal proceedings. I disagree and conclude that the statute applies to civil proceedings only.
General principles of statutory construction dictate that when the language of a statute is clear and unambiguous, the statute should be construed so as to give effect to the plain meaning of the words (People ex rel. Harris v Sullivan, 74 NY2d 305, 309). However, this Court has recognized that “[flew words are so plain that the context or the occasion is without capacity to enlarge or narrow their extension” (Surace v Danna, 248 NY 18, 21). Accordingly, we must examine a “ ‘statute’s legislative *744 history and context to determine its meaning and scope’ ” (Matter of Knight-Ridder Broadcasting v Greenberg, 70 NY2d 151, 158, n 4), and interpret the statute to effectuate the intent of the Legislature (People v Finnegan, 85 NY2d 53, 58; People v Eulo, 63 NY2d 341, 354).
Against that backdrop, we must evaluate the relevant terms, “any kind of seizure” and “for any cause whatever,” to determine the plain meaning of the terms within the context of section 12.03, reading each word in accordance with the “other operative features of the statute’s core overview” to reach a practical, over-all construction (Matter of Long v Adirondack Park Agency, 76 NY2d 416, 420). In addition, we must turn to the relevant legislative history to flesh out the intent of the Legislature.
The Museum argues that the words of section 12.03 bar the People from effectuating a subpoena duces tecum because the word “seizure,” as used in the statute, has both criminal and civil implications and that the subpoena issued here was tantamount to a “seizure.” However, accepting the Museum’s argument would abrogate a basic tenet of statutory construction which prohibits reading a statute in “vacuum-like isolation with absolute literalness” (id., at 420). Indeed, preceding the words “any kind of seizure” are the words “attachment, execution, sequestration, replevin, [and] distress” — terms which are exclusive to civil procedure. Thus, irrespective of whether the statute disallows “any kind of seizure,” the terms must be examined within the context of the statute as a whole. Bearing in mind that the rules of statutory construction forbid “the segregation of a few words from their context and from all the rest of the section or rule for purposes of construction” (Matter of Albano v Kirby, 36 NY2d 526, 530), I conclude that the terms “any * * * seizure” include only civil seizures.
Significantly, at one point in the statute, the term “seizure” is sandwiched between the words “attachment” and “levy,” words which have no application in criminal law. The Legislature would not have placed a term with dual application in criminal and civil law between two exclusively civil terms if it intended its meaning to be both criminal and civil. It is well settled that “[w]hen a word is susceptible of two or more significations, the meaning to be given must be determined from the context of the statute” (McKinneys Cons Laws of NY, Book 1, Statutes § 235). Even recognizing that the term “any” imports no limitations (Matter of Beach, 154 NY 242, 247), the conclusion is inescapable; without any other criminally rele *745 vant terms in the statute, the term “seizure,” which follows a listing of civil remedies, connotes civil seizures.[2]
Furthermore, the legislative history underlying the statute buttresses the conclusion that the Legislature never intended the statute to apply in criminal proceedings. First, the language of section 12.03 parallels a law enacted in 1880, later codified in the Code of Civil Procedure in 1909 (L 1909, ch 65, § 1) under chapter XIII, title II (“Execution against property”). In 1920, the Legislature moved the statute to section 250 of the Personal Property Law (L 1920, ch 934, § 1) in an effort to transfer sections of the Code of Civil Procedure to other appropriate laws (L 1920, ch 934, n 1). While that statute remains in the Personal Property Law and exempts from seizure property of any description at an international exhibition, held under the auspices of the United States in any city or county of New York, the Legislature used section 250 as a model for drafting the current statute, section 12.03 (Attorney General’s Mem for Governor, Bill Jacket, at 2, L 1968, ch 1065 [May 20, 1968]). Thus, section 12.03 virtually mirrors the language of the initial statute moved from the Code of Civil Procedure.
Generally, earlier statutes are “properly considered as illuminating the intent of the Legislature in passing later acts, especially where there is doubt as to how the later act should be construed. * * * It is incumbent on the court, in searching *746 for the proper interpretation of an enactment, to refer to the prior state of the law upon the matter” (McKinney’s Cons Laws of NY, Book 1, Statutes § 222). There is no indication in any of the legislative history that the move from the Code of Civil Procedure, then ultimately to the Arts and Cultural Affairs Law, was intended to extend the statute’s reach to criminal actions. Thus, having derived from a civil statute and without new wording to indicate the Legislature’s contrary intent to expand its application, section 12.03 cannot properly be deemed to affect provisions of the Criminal Procedure Law (see, e.g., People v Romero, 91 NY2d 750, 756-757).
In People v Romero (supra), this Court addressed whether the Attorney General was authorized under Judiciary Law § 476-a (1) to criminally prosecute a defendant. Noting the statute’s civil roots, we stated “the derivation of the statute offers a very good explanation as to why section 476-a does not explicitly state that the action to be brought by the Attorney-General is civil and not criminal. As part of the former Civil Practice Act, there was no need to be redundant and denote the action as civil” (id., at 757 [emphasis in original]).[3]
Second, the impetus underlying the enactment of section 12.03 was a civil lawsuit. Specifically, in 1968, a well-known, out-of-State artist loaned a substantial portion of his work to a Buffalo museum for exhibition. His work was subsequently seized under an order of attachment in a lawsuit brought against him by a domestic corporation. Alarmed at the circumstances under which the art was seized, the Legislature responded by mending a gap in the then-existing law that allowed local creditors to seize fine art exhibits under a host of provisional remedies. By exempting from seizure works of fine art of nonresidents, the bill served to “allay the fears of potential [fine art] exhibitors and enable the State of New York to maintain its pre-eminent position in the arts” (Governor’s Mem approving L 1968, ch 1065, 1968 NY Legis Ann, at 495 [June 22, 1968]).
*747 As the former Attorney General and proponent of the bill explained, in order to further the statute’s purpose, “the exemption from legal seizures by local creditors must be full and unequivocal” (Supplemental Mem for Governor, Bill Jacket, at 8, L 1968, ch 1065 [emphasis added]). The former Attorney General went on to dispel the notion that the exemption provided by section 12.03 should not apply to judgment creditors. Contemplating the very problem which the bill sought to remedy — seizures by judgment creditors in civil proceedings— the Attorney General articulated, “I have taken into account the relatively small number of judgment-creditors whose rights might possibly be affected, as compared with the potentially large number of non-resident lenders to museum exhibitions who would probably be frightened-off by anything other than an omnibus exemption” (id., at 10). The legislative history simply does not illustrate that either the sponsors or proponents of the bill ever contemplated criminal processes.
Notwithstanding the foregoing, even if section 12.03 could be read as pertaining to both criminal and civil law, the statute would be inapplicable under these circumstances because a subpoena duces tecum “does not authorize the seizure, impoundment or other disruption in possession of * * * property” (Matter of Heisler v Hynes, 42 NY2d 250, 252). Thus, the Museum’s contention that the subpoena duces tecum requiring it to produce the paintings was tantamount to a “seizure” lacks merit. A seizure occurs “when there is some meaningful interference with an individual’s possessory interests in * * * property” (United States v Jacobsen, 466 US 109, 113). We have stated that a subpoena duces tecum “is not intended to deprive its custodian of control [of the evidence] which is compatible with its production” (Matter of Heisler v Hynes, supra, at 252), and a Grand Jury may not hold subpoenaed objects indefinitely (Matter of Hynes v Moskowitz, 44 NY2d 383, 395). The purpose of a subpoena duces tecum is simply to direct a witness to appear and produce specified physical evidence (id.). The materials sought by the Grand Jury are furnished by the subpoenaed person at the time and place prescribed by the court and, on motion to limit possession of subpoenaed materials, the reasonableness of the terms and duration of possession can also be judicially determined (id., at 395-396). A “ ‘subpoena to appear before a grand jury is not a “seizure” in the [constitutional] sense, even though that summons may be inconvenient or burdensome’ ” (id., at 395, quoting United States v Dionisio, 410 US 1, 9).
*748 In this case, the People argue that retention of the paintings is to effectuate “nothing more than what a Grand Jury investigation should: it will determine whether a criminal action should begin.” That the interests of the People overlap with those of the Bondi and Grunbaum heirs to keep the paintings within the jurisdiction is not indicative of the People’s bad faith intention to “seize” the paintings and retain them any longer than necessary for the Grand Jury to complete its investigation.
The majority concludes that the paintings have been “seized” by the District Attorney, implicating the Fourth Amendment of the United States Constitution and article I, § 12 of the New York State Constitution.[4] In effect, the District Attorney may not retain the paintings to further his criminal investigation, pursuant to the majority’s holding. At a minimum, however, the District Attorney should be permitted to ascertain the authenticity of the two paintings. Clearly, the Museum’s assertion that the paintings are authentic is not binding on the District Attorney.[5] Nevertheless, without permitting this limited inspection or even examining the contract between the Museum and the Leopold Foundation, this Court concludes that the paintings have been “seized” and that the Leopold Foundation’s possessory interest in the paintings is superior to the production of the paintings during an investigation of allegedly stolen art.
There is no question that section 12.03 prevents civil seizures of any kind and that a main objective of the statute is to encourage the free flow of art into New York, enabling the State to maintain its reputation as a preeminent cultural center. However, section 12.03, aimed at benefitting and furthering public interest, should not be read to prevent the District Attorney from zealously investigating potential crimes, *749 an equally, if not more compelling public need. Moreover, the statute should not be construed so as to upset the broad exploratory powers of Grand Juries to investigate and indict criminal offenders (Virag v Hynes, 54 NY2d 437, 442-443; CPL 190.25).
Indeed, the majority’s conclusion today creates potentially adverse consequences beyond the parties in this case and conflicts with New York law which “has long protected the right of the owner whose property has been stolen to recover that property” (Guggenheim Found. v Lubell, 77 NY2d 311, 317). Under the majority’s ruling, the District Attorney and a Grand Jury will have exceeding difficulty in obtaining a work of fine art loaned by a nonresident to any nonprofit cultural institution, however relevant to a criminal investigation. Certainly, the Legislature could not have intended that New York assist the free flow of stolen art under an umbrella of complete immunity from civil and criminal processes. Such a ruling adversely affects society as a whole, whose “ ‘interest is best served by a thorough and extensive investigation’ ” into potential crimes (Virag v Hynes, supra, at 443, quoting Wood v Georgia, 370 US 375, 392). And, while the relevancy of holding these paintings in this particular investigation is hotly contested by the parties (despite the difficulty in prospective determinations regarding the propriety of evidence for Grand Jury investigations), one could envision circumstances where retention of loaned fine art would be crucial to the resolution of a criminal investigation (e.g., fingerprints, blood or other samples needed for physical evidence). Such physical evidence would be virtually impossible to gather if, as the majority holds, section 12.03 immunizes loaned art from criminal processes, thereby frustrating the “ ‘public’s interest in the fair and expeditious administration of the criminal laws’” (id., at 444, quoting United States v Dionisio, 410 US 1, 17, supra).
In sum, based on the foregoing conclusions, I would affirm the Appellate Division order and deny the Museum’s motion to quash the subpoena.
Chief Judge Kaye and Judges Bellacosa, Levine, Ciparick and Rosenblatt concur with Judge Wesley; Judge Smith dissents and votes to affirm in a separate opinion.
Order reversed, etc.

. The contract is not part of the record on appeal.

. The Museum’s attempt to liken Arts and Cultural Affairs Law § 12.03 to the Federal Immunity from Seizure Act (22 USC § 2459 [a]), applicable to criminal and civil proceedings, lacks merit. The relevant language of 22 USC § 2459 (a) provides that no court of the United States, or any State, “may issue or enforce any judicial process, or enter any judgment, decree, or order, for the purpose or having the effect of depriving such institution, or any carrier engaged in transporting such work or object within the United States, of custody or control of such object if before the importation of such object the President or his designee has determined that such object is of cultural significance” (emphasis added). While the Federal statute does not expressly state whether its application is civil or criminal, “any judicial process” broadly encompasses criminal proceedings, including a criminal subpoena, which is a process of the court (CPL 610.10 [2]; Preiser, Practice Commentaries, McKinney’s Cons Laws of NY, Book 11 A, CPL 610.20, at 304). Absent from the Federal statute, however, is a listing of terms exclusive to either criminal or civil processes.
In contrast, section 12.03 is clearly more restrictive than the Federal statute. Section 12.03 expressly delineates that “[n]o process of attachment, execution, sequestration, replevin, distress or any kind of seizure shall be served or levied upon any work of fine art.” The statute does not offer complete immunity from “any kind of seizure by legal process,” as the Museum contends. Instead, it expressly articulates exactly what types of processes are exempt— civil processes.

. Additionally, the majority’s position is arguably further undercut by the placement of section 12.03 in article 12 of the Arts and Cultural Affairs Law, entitled “Artist-Art Merchant Relationships.” Section 12.03 is one of two sections grouped under article 12. The first section, section 12.01, regulates the consignment relationship between an artist and an art merchant. That statute exclusively addresses issues relevant to civil law (i.e., consignments, liens, security interests, and trust relationships). Thus, it is unlikely that an exclusively civil statute, section 12.01, would be grouped under the same article with a statute having both criminal and civil applications.

. The Fourth Amendment states, “The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.” Article I, § 12 of the New York Constitution also includes these words and provides similar protection.

. It is worth noting that these paintings have never been produced pursuant to the subpoena duces tecum issued by the District Attorney. The subpoena was served on the Museum on January 7, 1998. The Museum moved to quash the subpoena on January 22, 1998. By agreement, the Museum has retained possession of the paintings pending resolution of these proceedings.